KABATECK BROWN KELLNER LLP
BRIAN S. KABATECK, SBN 152054
(bsk@kbklawyers.com)
RICHARD L. KELLNER, SBN 1714146
(rlk@kbklawyers.com)
644 South Figueroa Street
Los Angeles, CA 90017
Tel:  (213) 217-5000
Fax: (213) 217-5010

CHITWOOD HARLEY HARNES LLP
GREGORY E. KELLER (admitted *Pro Hac Vice*)
(gkeller@chitwoodlaw.com)
DARREN T. KAPLAN (admitted *Pro Hac Vice*)
(dtkaplan@chitwoodlaw.com)
2300 Promenade II
1230 Peachtree Street, N.E.
Atlanta, GA 30309
Tel:  (404) 873-3900
Fax: (404) 876-4476

Attorneys for Plaintiffs and
the Preliminarily Certified Class

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

In re: HP LASER PRINTER
LITIGATION

**CASE NO. SA CV 07-0667**

HON. ANDREW J. GUILFORD

**JOINT DECLARATION OF
RICHARD L. KELLNER AND
DARREN T. KAPLAN IN SUPPORT
OF PLAINTIFF'S MOTION FOR
FINAL APPROVAL OF CLASS
ACTION SETTLEMENT**

We, Richard L. Kellner and Darren T. Kaplan, under penalty of perjury, declare as follows:

1.     Richard L. Kellner is a partner at Kabateck Brown Kellner LLP ("KBK") and Darren T. Kaplan is a partner at Chitwood Harley Harnes LLP ("Chitwood") (collectively, "class counsel").  Class counsel represent plaintiff Kelsea Baggett and the preliminarily certified class in *re HP Laser Printer Litigation*.

2.     We have personal knowledge of the matters set forth below and submit this joint declaration in support of Plaintiff's Motion for Final Approval of the Class Action Settlement.

3.     The *Baggett* action (*Kelsea Baggett v. Hewlett-Packard Company*, Case No. SA CV 07-00667) was commenced in the United States District Court for the Central District of California (Guilford, J.) on July 6, 2007.

4.     HP filed a motion to dismiss, attacking all of the causes of action set forth in the complaint.  By order dated October 30, 2007, this Court largely denied HP's motion, only dismissing the claim for unjust enrichment.

5.     For the next eighteen months, the parties engaged in extensive discovery in anticipation of a motion for class certification and HP's motion for summary judgment. The discovery included the deposition of nine witnesses located across the country, the review of more than 300,000 pages of documents, the subpoena of two third-party witnesses, the retention and consultation of leading experts, the inspection of several of the *Baggett* printers, and extensive legal research regarding the sufficiency of the claims. A protective order was negotiated and executed.  Plaintiff and proposed class representative Kelsea Baggett was deposed for a full seven hours, and extensive document and interrogatory requests were propounded and answered.  As a result of the foregoing, Plaintiffs and their counsel obtained comprehensive knowledge of HP's printer technology which extended to not only the *Baggett* action, but also the *Young* action.

6.     Class counsel engaged in comprehensive discovery that exposed HP to substantial potential negative publicity if it continued to employ the technology that prevented users from having full access to all of the toner purchased.  Estimates that Plaintiffs obtained through discovery show that the cartridges were designed to terminate printing while upwards of 9 percent of the toner remained in the cartridges.

7.     Plaintiff Baggett prepared a motion for class certification, which was thoroughly and completely briefed.  At the same time, HP filed a motion for summary judgment based upon claims that, among other things, Baggett could not prove justifiable reliance on HP's alleged misrepresentations.  On September 29, 2009, the Court granted HP's motion for summary judgment against the named plaintiff in the *Baggett* action on all claims and denied as moot the fully briefed motion for class certification.  On November 17, 2009, Plaintiff Baggett appealed the Court's order granting judgment in favor of HP to the United States Court of Appeals for the Ninth Circuit.

8.     The *Young* action (*James Young v. Hewlett-Packard Company*, Case No. Case No. CV 09-00315) was commenced in the United States District Court for the Central District of California (Guilford, J.) on January 14, 2009.

9.     On largely the same grounds on which HP prevailed in the summary judgment motion in the *Baggett* action (as well as others), HP moved to dismiss the *Young* action.  By order dated March 16, 2010, the Court granted HP's motion to dismiss the *Young* action with prejudice.  On April 9, 2010, Plaintiff Young appealed the Court's order granting judgment in favor of HP to the United States Court of Appeals for the Ninth Circuit.

10.     Prior to reaching settlement, Plaintiffs were appealing the district court orders granting HP summary judgment in the *Baggett* action and dismissal of the *Young* action.  Nonetheless, through extended settlement negotiations before Ret. Judge James Warren, Plaintiffs  successfully negotiated a class settlement that fulfilled many of the goals of the litigation.

11.     Throughout the *Baggett* and *Young* actions, the counsel for the parties engaged in informal settlement discussions.  However, it was HP's concession that this litigation was one of the motivators for its change in behavior – despite the fact that HP had secured judgments in the District Court – that animated the parties attempts reach a settlement of the actions.

12.     Through extended settlement negotiations before Ret. Judge James Warren, Plaintiffs successfully negotiated a class settlement that provides virtually all of the injunctive relief that could have been achieved if the action were to have proceeded to trial.  First, with respect to future printer lines, HP acknowledged that virtually all of its future printers would not have any hardstop (override or otherwise) and therefore users will be able to print using all of the toner in their HP color laser printer cartridges.

13.     Second, with respect to the *Young* class, where Plaintiffs allege that HP failed to fully disclose the existence and use of technology that allows user to "override" the hardstop that prevents user access to all of the toner in the HP color laser toner cartridges, HP agreed to provide that notice directly to users through the comprehensive notice program.  With respect to the *Baggett* class, HP did not have the ability to change the technology on those machines, and the most that could be done was to give full disclosure of the claims through the comprehensive notice program.  All of this has been provided through the notice program, with live links established prior to final approval.

14.     Plaintiffs nevertheless tried to get something of substance for the Class.  HP ultimately agreed to provide a total of $5 million in e-credits to class members which could be used to purchase HP products.  While the e-credits are relatively small (amounting to $7 or $13 for each *Young* or *Baggett* printer, respectively), they could be used for some products that cost less than $13.00.

15.     HP also agreed to pay up to $750,000 for the comprehensive notice program that included direct e-mail notice (furnished by HP at no cost), publication notice in Parade magazine, USA Weekend, and CIO magazine; and banner advertisements on

1    Yahoo.com and other websites through 24/7 Real Media Network as well as a dedicated

2    website.

3          16.    Further, Plaintiff and class counsel believe that the relief to the *Baggett* and

4    *Young* classes as a result of this litigation, particularly when the litigation served as a

5    catalyst for a change in corporate behavior by HP, would entitle class counsel – based

6    upon their lodestar alone – to an amount substantially more than $2,750,000.00.

7          17.    The extent of benefits to the class from this relief can be easily demonstrated

8    as follows.  First, with respect to the *Young* action, HP has acknowledged that there are

9    approximately 2,300,000 printers that have been sold.  Second, through discovery,

10   Plaintiffs uncovered documents that show that HP color laserjet printers are designed to

11   have approximately 9% of the toner remaining at the time that printing functions are

12   terminated.  Third, replacement toner cartridges for the printers in the *Young* class range

13   in prices from $87.14 and $325.99.

14         18.    Accordingly, if only 10% of the class were provided with information

15   regarding the "override" that they did not previously have, and they were able to use the

16   9% of the toner from just three replacement cartridges, the cumulative value of toner that

17   would be now available to the class would be as follows, if one presumes that there were

18   only 4 replacement cartridges used for the life of the printers in the class from this point

19   forward:

20             2,300,000 printers

21             x 10% affected printers

22             x $206.06 (average price of toner)

23             x .09% (the 9% of toner now available to members)

24             x  4 cartridges (for future life of printers)

25             = $17,061,768.00

26         Of course, if the percentage of affected printers goes down to even 3%, the value to

27   the class remains a substantial amount.  These savings, of course, pale in comparison to

28

– 4 –

**JOINT DECLARATION IN SUPPORT OF MOTION FOR FINAL APPROVAL (CASE NO. CV-07-0667 AG)**

1 │ the benefit derived from all future printer sales which do not have the hardstop

2 │ technology (or even need the override).

3 │     19.     Class counsel believe that the relief to the *Baggett* and *Young* classes as a

4 │ result of this litigation, particularly when the litigation served as a catalyst for a change in

5 │ corporate behavior by HP, would entitle class counsel – based upon their lodestar alone –

6 │ to an amount substantially more than $2,750,000.00.

7 │     20.     KBK and the Chitwood law firms are experienced in large complex class

8 │ action negotiations, settlements and trials.

9 │     21.     Class counsel are extremely knowledge about the claims, defenses , facts

10 │ and law applicable to this case and therefore have sufficient information to properly

11 │ evaluate the value and mutual benefit of the settlement agreement.  Class counsel have

12 │ reasonably spent a total of 11,366.25 hours on this case.

13 │     22.     Class counsel has managed to settle this litigation on terms favorable to the

14 │ Class without the substantial risk, expense, uncertainty and delay of continued litigation,

15 │ trial and appeal.  Based upon the foregoing, class counsel has concluded that a settlement

16 │ according to the terms and conditions set forth in the Agreement is fair, reasonable,

17 │ adequate, and in the best interest of the Class.

18 │     23.     Class counsel and counsel for HP entered into the Settlement Agreement

19 │ after extensive, arduous, arm's length negotiations following substantial litigation,

20 │ discovery and factual investigation and legal analyses of the claims and defenses of the

21 │ parties.

22 │     24.     Class counsel endorses the Settlement as fair, reasonable and adequate.

23 │ Class counsel who are actively involved in complex federal civil litigation have weighed

24 │ all of the above factors and have concluded that the settlement is a favorable result which

25 │ is in the best interests of the Class.

26 │     25.     Moreover, prior to reaching a settlement, class counsel and counsel for

27 │ Defendant engaged in extensive negotiation, including an exchange of substantial

28 │ information.

26.     Three of the individuals who initially expressed dissatisfaction with the settlement, thereafter retracted their opposition when they were informed that the settlement provides injunctive relief and that the district court had entered judgments in HP's favor at the trial court level.  Attached as Exhibits A, B and C is a copy of the emails from those three individuals who retracted their dissatisfaction with the settlement.

27.     The electronic credits provide through the Settlement can be used for a full range of products offered by HP – including many products that cost *less* than the credits individually available under the Settlement.   For example, as set forth in the supplemental papers in support of preliminary approval, the following products are offered for sale on the HP website for less than $13: Laser paper, Multipurpose 8.5x11, 500 count ($6.99); Inkjet paper, Multipurpose 8.5x11, 500 count ($6.99); Inkjet paper, Multipurpose 8.5x11 Recycled, 500 count ($6.99); HP DDS Cleaning Cartridge ($6.99); Inkjet photo paper, 4x6 with tab, high gloss, 20 count ($7.99); HP DDS-4 Data Cartridge (150m) ($7.99); Laser paper, Multipurpose Legal 8.5x14, 500 count ($8.99); Inkjet paper, Multipurpose Legal 8.5x14, 500 count ($8.99); Laserjet paper, 8.5 x11, 500 count ($8.99); Inkjet paper, Bright White Inkjet 8.5x11, 500 count ($8.99); Inkjet everyday photo paper, 4x6 with tab, semi-gloss, 100 count ($9.99); Inkjet everyday photo paper, 8.5x11, semi-gloss, 50 count ($9.99); HP Mobile Remote Control for Pavilion Series ($9.99 – after instant $10.00 rebate); Inkjet premium photo paper, 8.5x11, glossy, 15 count ($10.99); Laser Multipurpose 11x17 paper, 500 count ($12.99); Inkjet paper, Multipurpose 11x17 paper, 500 count (12.99); and Inkjet photo paper, 8.5x11, glossy, 25 count ($12.99).

28.     As originally pled, the *Sutherland* action was substantively no different than the *Young* or *Baggett* actions, in that it claimed that HP employed technology that prevented users from having access to all of the toner that remained in the cartridge at the time of shutdown.  Attached as Exhibit D is a true and copy of the *Sutherland* complaint.

1    29.    Since January 2009, upon information and belief, the *Sutherland* case

2  languished in the San Francisco Superior Court without any meaningful litigation

3  activity.

4    30.    In or around June 2010, after the settlement in this action had been agreed to

5  and long after substantive adverse rulings had been entered in the *Baggett* and *Young*

6  actions, the complaint in the *Sutherland* action was amended.  There is presently a

7  demurrer pending to have the Sutherland action dismissed.  Attached as Exhibit E is a

8  true and correct copy of the demurrer presently pending in the *Sutherland* action.

9    31.    In a writing Mr. Vlastone sent to class counsel, he acknowledged that

10  conventional means for getting the class certified would not be successful.  Instead, Mr.

11  Vlastone admitted that he and the *Sutherland* team intend to circumvent the legal process

12  entirely and coerce the HP Board of Directors to agree to a settlement.  Attached as

13  Exhibit F is a true and correct copy of the document prepared by Mr. Vlastone which

14  discusses the *Sutherland* strategy.

15    32.    During multiple telephone calls with Mr. Vlastone, we told him about the

16  problems in the Sutherland case.  Among other things, Mr. Vlastone acknowledged that

17  HP's representation that users get a specified yield at 5% average coverage for color

18  and/or black cartridges was accurate – it was just his position that people did not use their

19  printers in such a way.

20    We declare under penalty of perjury under the laws of the United States that the

21  foregoing is true and correct and that this declaration was executed on this 14th day of

22  January 2011.

23

24            _/s/Richard L. Kellner_
              RICHARD L. KELLNER

25

26            _/s/Darren T. Kaplan_
27            DARREN T. KAPLAN

28

– 7 –

**JOINT DECLARATION IN SUPPORT OF MOTION FOR FINAL APPROVAL (CASE NO. CV-07-0667 AG)**

**Exhibit A**

| From: | Brad Acord |
|-------|-----------|
| To: | Richard Kellner |
| Subject: | Re: Bogus settlement and my opinion |
| Date: | Thursday, December 02, 2010 11:26:13 AM |
| Attachments: | image001.png |

Dear Richard,

Thank you for taking the time to address my frustration. I have no fault with what you have done, something needed to be done. In fact your reply gave me some useful information I didn't have before.

It was extremely costly to throw my 9500 and supplies away because there was no fix.

Then I found out that my laser color 1305 was a problem too, and I have 2 of those and 3 extra cartridges.
Sure enough they timed out just a couple weeks ago. My second 1305 is a brand new printer I kept for backup, have never used and now the new toners I've had in stock will not work in either of them.

So thank you for changing the way HP does business. It used to be that 70% of their profit came from supplies, and I see why. Now they'll have to make a profit honestly.

Xerox will have my business the next time I buy a color laser printer, our company has already replaced almost all HP's with Xerox (and others) over 200 printers.

Thank you again for taking the time to explain what happened, it may also be that I can ressurrect the 1305 now that I know their may be a fix with what you refer to as the: *"Young class, which has technology that permits the user to "override" the hardstop"*

Well done,
Brad


On Thu, Dec 2, 2010 at 10:06 AM, Richard Kellner <rlk@kbklawyers.com> wrote:

Dear Brad:


Thank you for taking the time to express your opinion regarding the HP laserjet settlement.  I appreciate your frustrations.  I thought that it might be useful for you to have all of the information underlying this settlement.


I hope the following helps:

- We commenced this class action in July of 2007, in response to what we believed to be HP's unfair business practice of designing its printers.

- In September 2009, the District Court dismissed our case and granted judgment in HP's favor. We were forced to file an appeal in the Ninth Circuit Court of Appeals, where the case was pending when we reached the settlement.

- Our firms spent over 13,000 hours in time and almost $200,000 in costs to prosecute this case. We traveled around the U.S. taking the depositions of scores of HP witnesses, reviewed hundreds of thousands of documents, interviewed hundreds of HP customers, and hired and worked with experts.

- While the appeal was pending and despite the fact we lost, we negotiated a settlement of the case.

- HP has agreed to an injunction that achieves most of the injunctive relief that we originally asked the court to grant.

- As a result of this litigation, virtually all (if not all) of the future lines of HP color laserjet printers will not have the technology in them that prevents users of HP color laserjet printers from exhausting the toner in the cartridges that they purchased. For all members of the *Young* class, which has technology that permits the user to "override" the hardstop, the settlement provides them with notice on the existence of the "override" and where the instructions for the "override" can be found. For members of the *Baggett* class, we confirmed that HP could not change the technology of the printers/cartridges, and the most that they could do is provide notice of the situation in the class notice that has been sent to you.

- The settlement will affect millions of printers already in existence and many more to be manufactured in the future. It will help to change the way printers are designed in the United States.

- With respect to the e-credits, there are certain items that can be purchased with the full credit (such as paper, etc.) – so the e-credits do provide some value. While we would have liked to have obtained a greater monetary benefit for the class, the fact is that the case is on appeal. Given that the case was on appeal, the primary benefit of this settlement remains the real injunctive relief and HP's changes in its business practices.

I hope that this information provides you with a more complete understanding of this case. If you would like more information, please let us know. Of course, if you would not like to participate in this settlement, you have the right to "opt out" of the settlement and, if you choose, prosecute your individual action.

Thank you again for the time you spent in sending your comments about the

settlement.

Richard L. Kellner *Partner*
Historic Fire Engine Co. No. 28 Building
644 South Figueroa Street,  Los Angeles, CA 90017
T: 213.217.5000

**XBK**

www.kbklawyers.com

**Kabateck** Brown Kellner LLP

**From:** Brad Acord [mailto:bradalaska@gmail.com]
**Sent:** Monday, November 08, 2010 11:39 PM
**To:** Richard Kellner
**Subject:** Bogus settlement and my opinion

This is a ridiculous settlement.

I HAD OVER $300 IN TONERS that couldn't be used for my 9500, I threw them
and the printer away.

Now I see that the CM1015 I have may have the same issue. It looks like that will
have to be thrown away along with the 3 extra toner cartdridges I bought when I
purchased my printer worth $500.

HP is crooked when it doies this.

I'll never buy an HP Laser printer again.

Fortunately I also influence the purchase of our company and thgey havewn't
bought an HP for a couple of years because of this. We have almost 200 hundred
printers and hardly an HP left.

We have plenty of thge expired toner cartdridges left.

How about buying those back instead.

Brad,

I'm done with HP and their junk and crooked ways.

**Exhibit B**

From:         Dr. T
To:           Richard Kellner
Subject:      Re: Notice of Proposed Settlement of HP LaserJet Litigation - Reference #23247774; response objection to the Court
Date:         Saturday, December 04, 2010 3:25:17 PM
Attachments:  image001.png

Thank you for your clarification.


On Thu, Dec 2, 2010 at 2:06 PM, Richard Kellner <rlk@kbklawyers.com> wrote:

Dear Mark:


Thank you for taking the time to express your opinion regarding the HP laserjet settlement. When we received your email, we thought you may not have all the information about the proposed settlement and may want some more information.


I hope the following helps:


• We commenced this class action in July of 2007, in response to what we believed to be HP's unfair business practice of designing its printers.

• In September 2009, the District Court dismissed our case and granted judgment in HP's favor. We were forced to file an appeal in the Ninth Circuit Court of Appeals, where the case was pending when we reached the settlement.

• Our firms spent over 13,000 hours in time and almost $200,000 in costs to prosecute this case. We traveled around the U.S. taking the depositions of scores of HP witnesses, reviewed hundreds of thousands of documents, interviewed hundreds of HP customers, and hired and worked with experts.

• While the appeal was pending and despite the fact we lost, we negotiated a settlement of the case.

• HP has agreed to an injunction that achieves most of the injunctive relief that we originally asked the court to grant.

• As a result of this litigation, virtually all (if not all) of the future lines of HP color laserjet printers will not have the technology in them that prevents users of HP color laserjet printers from exhausting the toner in the cartridges that they purchased. For all members of the *Young* class, which has technology that permits the user to "override" the hardstop, the settlement provides them with notice on the existence of the "override" and where the instructions for the "override" can be found. For members of the *Baggett* class, we confirmed that HP could not change the technology of the printers/cartridges, and the most that they could do is provide notice of the situation in the class notice that has been sent to you.

• The settlement will affect millions of printers already in existence and many more to be manufactured in the future. It will help to change the way printers are designed in the United States.

• With respect to the e-credits, there are certain items that can be purchased with the full credit (such as paper, etc.) – so the e-credits do provide some value. While we would have liked to have obtained a greater monetary benefit for the class, the fact is that the case is on appeal. Given that the case was on appeal, the primary benefit of this settlement remains the real

public win from this settlement. They do not.

I am sure that the attorneys would not accept reimbursement that could only be spent at one vendor site, so why should the public?

This settlement weakens the confidence of the public in the legal process and the good judgment of the court, as do all the other settlements that limit competition in the marketplace. A terrible precedent. The court should impose the specification that HP's pricing will be no greater than the best value available on the internet, and that is the pricing to which the eCredit will be applied. All other solutions are simply to clear the docket and pay the attorneys and not in the best interest of the public.

I do not intend to appear at the hearing. I do not believe my objection will result in any fair play on the part of the court or of HP. And by the way, has HP's printer restriction to using the cartridges to completion been remedied? If not, why not?

Thank you for your time.

Marc A. Tanenbaum
770-853-1497

---------- Forwarded message ----------
From: **Hewlett-Packard** <Hewlett-Packard@email.americas.hp.com>
Date: Mon, Nov 8, 2010 at 5:55 PM
Subject: Notice of Proposed Settlement of HP LaserJet Litigation - Reference #23247774
To: doctormarc@gmail.com

**Error! Filename not specified.**

## NOTICE OF SETTLEMENT

> **If you purchased an HP color LaserJet printer, you may benefit from a Proposed Class Action Settlement.**
> **READ THIS NOTICE CAREFULLY. YOUR LEGAL RIGHTS ARE AFFECTED WHETHER YOU ACT OR DO NOT ACT. PLEASE CHECK THE SETTLEMENT WEBSITE AT www.HPLaserJetPrinterSettlement.com REGULARLY FOR UPDATES AND FURTHER DETAILS**

*The Federal Court authorized this Notice. This is not a solicitation from a lawyer.*

- A Proposed Settlement has been reached in two class action lawsuits involving certain Hewlett-Packard Company ("HP") LaserJet printers. The first lawsuit (*Baggett v. Hewlett-Packard Co.*, C.D. Cal. Case No. CV 07-0667 AG) claims that HP designed certain of its color LaserJet printers and print cartridges to prevent further printing after a certain amount of use even though toner remains in the print cartridge that could be used to print additional pages, that HP represented that certain print cartridges are "empty" and/or need to be replaced even though toner remains in the cartridge, that this technology prevented purchasers from using all of the allegedly useable toner in the print cartridge, from printing additional available pages and from using all of the printer's functions (such as continued printing) until the print cartridge at issue is replaced, and that HP interfered with the right of purchasers to possess and use all of the toner in the HP print cartridges and/or to print additional pages. The second lawsuit (*Young v. Hewlett-Packard Co.*, C.D. Cal. Case No. CV 09-00315 AG) involves different HP color LaserJet printers than those at issue in the *Baggett* lawsuit, but makes similar allegations and further alleges that HP failed properly to disclose that the relevant color LaserJet print cartridges include an "override" mechanism that permitted a user to continue printing as long as desired after any interruption or termination of printing caused by toner level in the print cartridge. HP denies all these claims. The Court (Honorable Andrew J. Guilford, United States District Court for the Central District of California) has ruled in favor of HP in each case, and each case has been appealed to the United States Court of Appeals for the Ninth Circuit. In order to avoid the expense and risks of continuing the lawsuit, the parties agreed to a Proposed Settlement.
- Your legal rights may be affected whether you act or do not act. Read this notice carefully.
- If you are eligible, the Proposed Settlement may provide an e-credit for future purchases of printers and printer supplies offered at www.shopping.hp.com. Any e-credits received as part of the settlement can only be used at www.shopping.hp.com.
- You are a Class Member if you purchased, leased, received as a gift or otherwise acquired in the United States an HP printer that is listed **here**. See questions 5 and 6 **here** for further information.
- You are not part of the class if you: (a) did not purchase, lease, receive as a gift or otherwise acquire a printer listed **here**; (b) are an employee, director, officer, or agent of HP or its subsidiaries and affiliated companies, (c) are the Judge of the Court in which the cases are pending or part of his immediate family or staff. See question 7 below.

injunctive relief and HP's changes in its business practices.

I hope that this information provides you with a more complete understanding of this case.  If you would like more information, please let us know.  Of course, if you would not like to participate in this settlement, you have the right to "opt out" of the settlement and, if you choose, prosecute your individual action.

Thank you again for the time you spent in sending your comments about the settlement.

Richard L. Kellner, Partner
Historic Fire Engine Co. No. 28 Building
644 South Figueroa Street, Los Angeles, CA 90017
T. 213.217.5000

KBK

Kabateck Brown Kellner LLP

---

**From:** Dr. T [mailto:doctormarc@gmail.com]
**Sent:** Monday, November 08, 2010 4:02 PM
**To:** info@hplaserjetprintersettlement.com; Richard Kellner; Khenning@morganlewis.com; Fcorrado@morganlewis.com
**Subject:** Fwd: Notice of Proposed Settlement of HP LaserJet Litigation - Reference #23247774; response objection to the Court

To:

| Settlement Administrator | Counsel for the Class: | Counsel for HP: |
|---|---|---|
| In re: HP LaserJet Printer Litigation<br>Settlement Administrator<br>P.O. Box 5270<br>Portland, OR 97208-5270<br>E-Mail: info@HPLaserJetPrinterSettlement.com<br>Facsimile: (877) 341-4607 | Richard L. Kellner<br>KABATECK BROWN KELLNER, LLP<br>644 S. Figueroa Street<br>Los Angeles, CA 90017<br>E-mail: rlk@kbklawyers.com | Kristofor T. Henning<br>Franco A. Corrado<br>MORGAN LEWIS & BOCKIUS LLP<br>1701 Market Street<br>Philadelphia, PA 19103<br>E-mail: Khenning@morganlewis.com<br>Fcorrado@morganlewis.com |

"You must also state in writing all objections and the reasons for each objection, and state whether you intend to appear at the Fairness Hearing either with or without separate counsel. You shall not be entitled to be heard at the Fairness Hearing or to object to the Settlement, and no written objections or briefs submitted by you shall be received or considered by the Court at the Fairness Hearing, unless written notice of your intention to appear at the Fairness Hearing and copies of any written objections and/or briefs are filed with the Clerk of Court at the address provided below in response to question 20, and served on Class Counsel and Defense Counsel on or before **January 4, 2011**. If you fail to file and serve timely written objections in the manner specified above, you shall be deemed to have waived all objections and shall be foreclosed from making any objection (whether by appeal or otherwise) to the Settlement."

Dear Sirs:

My objection is purely financial as a consumer. The restriction to use the eCredit at only one commercial site is fallacious and mean spirited. If HP is willing to certify that it's pricing is no greater than the lowest cost available on the internet, then perhaps this restriction is palatable. However, it is likely  that the eCredit applied to the price at this single commercial site will NOT be more favorable than a transaction without eCredit at any competitor's site. So how does the

| YOUR RIGHTS AND CHOICES: | | |
|---|---|---|
| **YOU MAY:** | | DUE DATE: |
| **FILE A CLAIM FORM** | This is the <u>only</u> way that you may get an e-credit. | **By February 15, 2011** |
| **OBJECT** | Write to the Court about why you don't like the Proposed Settlement. | **By January 4, 2011** |
| **EXCLUDE YOURSELF** | Ask to get out of the Proposed Settlement. If you do this, you cannot get any Settlement benefits, but you keep your right to sue HP yourself regarding the claims in the lawsuits. | **By January 4, 2011** |
| **APPEAR IN THE LAWSUIT OR GO TO A HEARING** | Participate in the Proposed Settlement on your own or through your own lawyer. You can also ask to speak in Court about the Proposed Settlement. | **By January 31, 2011** |
| **DO NOTHING** | You get no individual monetary settlement benefits and you give up the right to sue HP on your own regarding the claims later. | |

- These rights and choices - **and the deadlines to exercise them** - are further explained in this Notice.
- These **deadlines may be moved, cancelled or otherwise modified**, so please check the settlement website at www.HPLaserJetPrinterSettlement.com regularly for updates and further details.
- The Court still has to decide whether to approve the Proposed Settlement. Benefits will be provided only if the Court approves the Proposed Settlement and after any appeals are resolved.

## WHAT THIS NOTICE CONTAINS

### BASIC INFORMATION

1. Why did I get this Notice?
2. What are the lawsuits about?
3. Why is this a class action?
4. Why is there a Proposed Settlement?

### WHO IS IN THE PROPOSED SETTLEMENT CLASS

5. How do I know if I'm part of the Proposed Settlement Class?
6. How do I know if my printer is one of the models covered by the Proposed Settlement?
7. Are there exceptions to being included?

### THE PROPOSED SETTLEMENT BENEFITS - WHAT YOU MAY GET

8. What does the Proposed Settlement provide?
9. What are e-credits and what can I use them for?
10. What am I giving up to stay in the Class?

### HOW TO GET PROPOSED SETTLEMENT BENEFITS

11. How do I get an e-credit?
12. When will I get my Proposed Settlement benefits?

### YOUR RIGHTS AND CHOICES - EXCLUDING YOURSELF FROM THE PROPOSED SETTLEMENT

13. Can I get out of the Proposed Settlement and the Class?
14. How do I exclude myself from the Proposed Settlement?
15. If I don't exclude myself, can I still sue HP for the same things later?
16. If I exclude myself, can I get benefits from the Proposed Settlement?

### YOUR RIGHTS AND CHOICES - OBJECTING TO THE PROPOSED SETTLEMENT

17. How do I tell the Court I don't like the Proposed Settlement?
18. What's the difference between objecting to the Proposed Settlement and excluding myself from the Proposed Settlement?

### YOUR RIGHTS AND CHOICES - APPEARING IN THE LAWSUIT

19. Can I appear or speak in this lawsuit and Proposed Settlement?
20. How can I appear in this lawsuit?

**IF YOU DO NOTHING**

21. What happens if I do nothing at all?

**THE LAWYERS REPRESENTING YOU**

22. Do I have a lawyer in this case?
23. How much will the lawyers for the Class be paid, and how will they be paid?

**THE COURT'S FAIRNESS HEARING**

24. When and where will the Court decide whether to approve the Proposed Settlement?
25. Do I have to come to the hearing?
26. Can I speak at the hearing?

**GETTING MORE INFORMATION**

27. Are more details about the lawsuit and Proposed Settlement available?
28. How do I get more information?

## BASIC INFORMATION

### 1. Why did I get this Notice?

The Court ordered that this Notice be given because you have the right to know about a Proposed Settlement that may affect you. You have legal rights and choices to make before the Court decides whether to approve the Proposed Settlement.

This Notice explains:

- What the lawsuits are about.
- Who is included in the Proposed Settlement.
- How the Proposed Settlement may benefit you.
- What your legal rights are.
- How to get the benefits of the Proposed Settlement.

### 2. What is the lawsuit about?

This lawsuit is a combination of two separate class action lawsuits filed against HP. The first lawsuit (*Baggett*) claims that HP designed certain of its color LaserJet printers and print cartridges to prevent further printing after a certain amount of use even though toner remains in the print cartridge that could be used to print additional pages, that this technology prevented purchasers from using all of the allegedly useable toner in the print cartridge, from printing additional available pages and from using all of the printer's functions (such as continued printing) until the print cartridge at issue is replaced, that HP represented that certain print cartridges are "empty" and/or need to be replaced even though toner remains in the cartridge, and that HP interfered with the right of purchasers to possess and use all of the toner in the HP print cartridges and/or to print additional pages from the print cartridges that they purchased.

The second lawsuit (*Young*) involves different HP color LaserJet printers than those at issue in the Baggett lawsuit, but makes similar allegations and further alleges that HP failed properly to disclose that the relevant color LaserJet print cartridges include an "override" mechanism that permitted a user to continue printing as long as desired after any interruption or termination of printing caused by toner level in the print cartridge.

HP denies all these claims. Both actions are now combined as one lawsuit called In re: HP LaserJet Printer Litigation, Case No. CV 07-00667 AG. The Court in charge of this lawsuit is the United States District Court for the Central District of California and specifically the Honorable Andrew J. Guilford.

## 3. Why is this a class action?

In a class action, one or more people, called Class Representatives, sue on behalf of other people who have similar claims. All these people together are a "Class" or "Class Members." One Court decides all the issues in the lawsuit for all Class Members, except for those who exclude themselves from the Class. In a class action, the Court has a responsibility to assure that prosecution and resolution of the class claims by the Class Representatives and class counsel is fair. In this lawsuit, the Class Representatives are asking the Court to decide the issues for all purchasers of certain HP color LaserJet printers.

## 4. Why is there a Proposed Settlement?

The Settlement was the result of extensive good-faith negotiations between the plaintiffs and HP. The Proposed Settlement concludes litigation but is not the result of a court ruling in favor of either plaintiffs or HP. HP and counsel for plaintiffs in the *Baggett and Young* actions have considered that, if the claims asserted in their respective lawsuits are not settled now by voluntary agreement among the parties, future proceedings (including prosecution of any appeals) would be protracted and expensive, would involve highly complex legal and factual issues relating to class certification, liability, and damages, and would involve substantial uncertainties, delays, and other risks inherent in litigation. The class representatives and their attorneys have determined that the Settlement is in the best interests of all Class Members.

### WHO IS IN THE PROPOSED SETTLEMENT CLASS

## 5. How do I know if I'm part of the Proposed Settlement Class?

You are a Class Member if you purchased, leased, received as a gift or otherwise acquired in the United States a printer set forth here.

## 6. How do I know if my printer is one of the models covered by the Proposed Settlement?

You can check to see if your HP printer is one of the ones listed here by looking in the following areas on your printer: (a) looking on the front panel of the printer for the model name and number; (b) looking on the top of the printer; (c) looking on the underside of the printer; (d) opening the cartridge access door and looking near the cartridges; or (e) using HP's automatic product-detection tool. If you have any trouble finding the model name and number you can visit the Proposed Settlement website at www.HPLaserJetPrinterSettlement.com for further instructions.

## 7. Are there exceptions to being included?

You are not part of the Class if your printer model is not listed here.

In addition, all persons who are employees, directors, officers and agents of HP or its subsidiaries and affiliated companies, as well as the Judge of the Court in which the lawsuit is pending and his immediate family and staff are also excluded.

## THE PROPOSED SETTLEMENT BENEFITS – WHAT YOU MAY GET

### 8. What does the Proposed Settlement provide?

**The Proposed Settlement provides for a number of significant benefits,** including HP's agreement to post on its website a description of the operation of the Affected Models as it pertains to any interruption or termination of printing caused by toner level in their print cartridges, including a description of the mechanism in certain printers that allows users to "override" any termination in printing caused by the level of toner in their print cartridges. This description can now be found by clicking **here.** The specific injunctive relief agreed to between the parties can be found in the settlement agreement filed with the Court and located on the settlement website, www.HPLaserJetPrinterSettlement.com.

**HP also will contribute up to $5,000,000 in e-credits to be distributed to class members** who purchased, leased, received as a gift or otherwise acquired in the United States a printer listed **here** and satisfy the eligibility requirements set forth below. If the aggregate value of the e-credits to be awarded to class members exceeds $5,000,000, then the value of the individual e-credits to be provided to each class member shall be reduced on a pro rata basis, such that the aggregate value of e-credits does not exceed $5,000,000. For example and by way of illustration only, if the aggregate value of the total number of e-credits redeemed by class members is $10,000,000, then the value of each e-credit shall be reduced in value by fifty per cent (50%) to ensure that the aggregate value of the total number of e-credits awarded does not exceed $5,000,000. Accordingly, the parties will not know the exact value of each e-credit until after all claim forms have been received and validated by the Settlement Administrator. The values below ($7, $13) are the maximum amounts a class member could receive assuming there is no pro rata reduction in the value of the e-credits based upon the number of claim forms received. The categories of benefits are as follows:

**A. You may receive up to a $13.00 e-credit per Affected *Baggett* Model printer if you:**

(1) Purchased, leased, received as a gift or otherwise acquired in the United States an Affected *Baggett* Model listed here; and
(2) Properly complete the required electronic claim form.

**B. You may receive up to a $7.00 e-credit per Affected *Young* Model printer if you:**

(1) Purchased, leased, received as a gift or otherwise acquired in the United States an Affected *Young* Model listed here;
(2) Properly complete the required electronic claim form; and
(3) Submit a signed attestation form in which you certify, under penalty of perjury, that you: (a) received a message about a print cartridge's ability to provide additional printed pages; (b) believed that you were out of toner as a result of the message received; and (c) removed the print cartridge upon receiving the message without using the printer's "override" function. HP reserves the right to challenge any attestation submitted under this paragraph.

An electronic claim form must be completed for each affected printer.

When completing the electronic claim form on the settlement website at www.HPLaserJetPrinterSettlement.com, you will be required to provide your name, e-mail address, and a serial number for each printer that you own that you claim is an affected printer. If you do not have a serial number, you must submit to the Settlement Administrator some other proof of purchase (a receipt, invoice, purchase order, and/or the UPC bar code from the printer package, or similar documentation that reflects the eligible purchase). In addition, you may need to submit a signed attestation form as set forth above to complete the submission of your claim form.

### 9. What are e-credits and what can I use them for?

E-credits can be redeemed for printers and printer supplies only online at www.shopping.hp.com. E-credits may not be used in combination with other rebates or coupons for HP products, and one e-credit may be used per purchase order. E-credits received for multiple different printers will not be combined into a single e-credit. An e-credit may be used only once. E-credits are valid for six months from the date of issuance and can be transferred to members of your immediate family only. The specific products eligible for purchase will be determined at a later date.

## 10. What am I giving up to stay in the Class?

If you do not exclude yourself from the Class, then you are automatically in the Class if you own one of the printers listed here. If you stay in the Class, you can't sue or be part of any other lawsuit against HP about the claims in this lawsuit, as set forth below. In addition, if you stay in the Class, all the Court's orders will apply to you.

By staying in the Class, you become a Settlement Class Member and you are agreeing to fully, finally and forever release, relinquish, and discharge any current or future claims you might have against HP that relate to the claims in this lawsuit. The entire release contained in the Proposed Settlement Agreement includes:

Any and all claims, demands, rights, damages, obligations, suits, debts, liens, and causes of action of every nature and description whatsoever, ascertained or unascertained, suspected or unsuspected, existing or claimed to exist, including unknown claims against (a) HP and each of its employees, assigns, attorneys, agents, and all of its past, present, and future officers and directors; (b) All of HP's parents, subsidiaries, divisions, affiliates, predecessors, and successors, and each of their respective employees, assigns, attorneys, agents, resellers and past, present and future officers and directors; and (c) Any and all persons, entities, or corporations involved in any way in the design, manufacture, sale, service, or repair of the Affected Models or their corresponding print cartridges, and any other original equipment or manufacturing partner or any company that supplied any parts to HP or its original equipment or manufacturing partners for incorporation into or use in the construction of any of the Affected Models or their corresponding print cartridges (the "Released Parties") as of the Effective Date [1] by all of the Plaintiffs and all Settlement Class Members (and Plaintiffs' and Settlement Class Members' respective heirs, executors, administrators, representatives, agents, attorneys, partners, successors, predecessors-in-interest, and assigns) that:

(i)   were brought or that could have been brought against the Released Parties, or any of them, and that arise out of or are related in any way to any or all of the acts, omissions, facts, matters, transactions, or occurrences that were or could have been directly or indirectly alleged or referred to in the Action (including, but not limited to alleged violations of state consumer protection, unfair competition, and/or false or deceptive advertising statutes (including, but not limited to, Cal. Bus. & Prof. Code § 17200 et seq., Cal. Bus. & Prof. Code § 17500 et seq., and Cal. Civ. Code § 1750 et seq.); breach of contract; breach of express or implied warranty; fraud; unjust enrichment, restitution, trespass to chattels, conversion, declaratory or injunctive relief, and other equitable claims or claims sounding in contract and tort); and

(ii)   relate in any way to the quantity of output, amount of usable toner or value received from the Affected Models and their corresponding print cartridges, including but not limited to all claims that relate in any way to:

(A)   any warning, graphic, alert, message, or other source of information indicating that a print cartridge is empty, unable to provide additional printed pages or must be replaced, including without limitation any such warning, graphic, alert, message, or other source of information regarding the need to replace any such print cartridge and/or any termination or interruption in printing for the Affected Models and their corresponding print cartridges;

(B)   HP's use of smart chips, e-labels or other devices that electronically store data in connection with the Affected Models and their corresponding print cartridges;

(C)   HP's page yields for the Affected Models and their corresponding print cartridges;

(D)   The printed page output for the Affected Models and their corresponding print cartridges (including whether customers were able to print sufficient pages to reach HP's estimated page yield disclosures);

(E)   the amount of usable toner in the HP print cartridges used with the Affected Models;

(F)   HP's SureSupply program, including graphics and messaging related to toner status, and related marketing materials;

(G)   HP's specifications, marketing, disclosures, warranties, and representations (or lack thereof) regarding the quantity of output, amount of usable toner, or value received from the Affected Models and their corresponding print cartridges; and

(H)   HP's disclosures (or lack thereof) that certain of its color LaserJet print cartridges include an "override" mechanism that permitted a user to continue printing as long as desired after any interruption or termination of printing caused by toner level in the print cartridge.

"Released Claims" do not include: (i) claims for personal injury; or (ii) claims for repair service of Affected Models that, at the time of the Effective Date, are covered by any express product warranty by HP. The Parties otherwise intend for the term "Released Claims" to be construed as broadly as possible.

The Released Claims include known and unknown claims relating to the Action, and this Stipulation of Settlement is expressly intended to cover and include all such injuries or damages, including all rights of action thereunder. Settlement Class Members hereby expressly, knowingly, and voluntarily waive the provisions of Section 1542 of the California Civil Code, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

Settlement Class Members expressly waive and relinquish any and all rights and benefits that they may have under, or that may be conferred upon them by, the provisions of Section 1542 of the California Civil Code, or any other law of any state or territory that is similar, comparable, or equivalent to Section 1542, to the fullest extent that they may lawfully waive such rights or benefits pertaining to the Released Claims. In connection with such waiver and relinquishment, the Settlement Class Members hereby acknowledge that they are aware that they or their attorneys may hereafter discover claims or facts in addition to or different from those that they now know or believe exist with respect to Released Claims, but that it is their intention to hereby fully, finally, and forever settle and release all of the Released Claims known or unknown, suspected or unsuspected, that they have against the Released Parties. In furtherance of such intention, the release herein given by the Settlement Class Members to the Released Parties shall be and remain in effect as a full and complete general release notwithstanding the discovery or existence of any such additional different claims or facts. Each of the parties expressly acknowledges that it has been advised by its attorney of the contents and effect of Section 1542, and with knowledge, each of the parties hereby expressly waives whatever benefits it may have had pursuant to such section. Settlement Class Members are not releasing any claims for personal injury or any claims for repair or service of Affected Models that are, at the time of the Effective Date, covered by any express product warranty by HP. Plaintiffs acknowledge, and the Settlement Class Members shall be deemed by operation of the Final Judgment to have acknowledged, that the foregoing waiver was separately bargained for and is a material element of the Settlement of which this release is a part.

## HOW TO GET PROPOSED SETTLEMENT BENEFITS

### 11. How do I get an e-credit?

To obtain your e-credit, you **must** complete an electronic claim form (and, if instructed to do so, submit proof of purchase and/or an attestation form) at www.HPLaserJetPrinterSettlement.com by **February 15, 2011.**

### 12. When will I get my Proposed Settlement benefits?

Settlement benefits will be available only after the Proposed Settlement is approved and becomes final. The Court will hold a hearing on **January 31, 2011** to decide whether to approve the Proposed Settlement. If the Court approves the Proposed Settlement, there may be appeals, and the Proposed Settlement can't become final until all appeals are resolved. It is always uncertain how long appeals will take - they can take many months or longer. You should check the settlement website at www.HPLaserJetPrinterSettlement.com for updates on the status of the Proposed Settlement and applicable deadlines. Please be patient. Furthermore, please be aware that the parties will not know the exact value of each e-credit until after all claim forms have been received and validated by the Settlement Administrator.

## YOUR RIGHTS AND CHOICES - EXCLUDING YOURSELF FROM THE PROPOSED SETTLEMENT

### 13. Can I get out of the Proposed Settlement and the Class?

You can get out of the Proposed Settlement and the Class. This is called excluding yourself - or is sometimes referred to as "opting out" of the Class. If you exclude yourself, you can't get Proposed Settlement benefits and you can't object to the Proposed Settlement. But you keep the right to file your own lawsuit or join another lawsuit against HP about the claims in this lawsuit.

## 14. How do I exclude myself from the Proposed Settlement?

To exclude yourself, you must send by fax, U.S. Mail, or e-mail a letter that contains all of the following:

- Your name, current address and telephone number;
- A statement that you want to be excluded from the case In re: HP LaserJet Printer Litigation, Case No. CV 07-00667 AG, that you do not wish to be a Settlement Class Member, and that you want to be excluded from any judgment entered in this case;
- Your signature (or your lawyer's signature).

Your exclusion request must be signed, e-mailed, faxed or mailed and *postmarked, or the equivalent for fax or e-mail, by January 4, 2011*, to:

In re: HP LaserJet Printer Litigation Settlement Administrator
**HP LaserJet Settlement**
P.O. Box 5270
Portland, OR 97208-5270
E-mail: info@HPLaserJetPrinterSettlement.com
Facsimile: 877-341-4607

You cannot exclude yourself on the phone. You can exclude yourself by facsimile or e-mail.

## 15. If I don't exclude myself, can I still sue HP for the same things later?

No. Unless you exclude yourself, you give up the right to sue HP for the claims in this lawsuit. If you want to keep the right to sue HP in a new lawsuit, you have to exclude yourself from this Class and Proposed Settlement. Remember, any exclusion request must be signed, mailed, and postmarked (or the equivalent for fax or e-mail) by **January 4, 2011.**

## 16. If I exclude myself, can I get any benefits from this Proposed Settlement?

No. If you exclude yourself, you can't get any Proposed Settlement benefits.

**YOUR RIGHTS AND CHOICES - OBJECTING TO THE PROPOSED SETTLEMENT**

## 17. How do I tell the Court I don't like the Proposed Settlement?

If you're a Class Member and don't exclude yourself, you can tell the Court you don't like the Proposed Settlement or some part of it. You can give reasons why you think the Court should not approve it. The Court will consider your views.

To object, you must send by e-mail, fax or U.S. mail a written objection setting forth your full name, current address, and telephone number to the Settlement Administrator and send by e-mail or U.S. mail a copy to Class Counsel and Defense Counsel postmarked, or the equivalent for fax or e-mail, no later than **January 4, 2011.** Please use the following addresses:

| Settlement Administrator | Counsel for the Class: | Counsel for HP: |
|---|---|---|
| In re: HP LaserJet Printer Litigation Settlement Administrator P.O. Box 5270 Portland, OR 97208-5270 E-Mail: info@HPLaserJetPrinterSettlement.com Facsimile: (877) 341-4607 | Richard L. Kellner KABATECK BROWN KELLNER, LLP 644 S. Figueroa Street Los Angeles, CA 90017 E-mail: rlk@kbklawyers.com | Kristofor T. Henning Franco A. Corrado MORGAN LEWIS & BOCKIUS LLP 1701 Market Street Philadelphia, PA 19103 E-mail: Khenning@morganlewis.com Fcorrado@morganlewis.com |

You must also state in writing all objections and the reasons for each objection, and state whether you intend to appear at the Fairness Hearing either with or without separate counsel. You shall not be entitled to be heard at the Fairness Hearing or to object to the Settlement, and no written objections or briefs submitted by you shall be received or considered by the Court at the Fairness Hearing, unless written notice of your intention to appear at the Fairness Hearing and copies of any written objections and/or briefs are filed with the Clerk of Court at the address provided below in response to question 20, and served on Class Counsel and Defense Counsel on or before **January 4, 2011.** If you fail to file and serve timely written objections in the manner specified above, you shall be deemed to have waived all objections and shall be foreclosed from making any objection (whether by appeal or otherwise) to the Settlement.

If you object through a lawyer, you will have to pay for the lawyer yourself.

## 18. What's the difference between objecting to the Proposed Settlement and excluding myself from the Proposed Settlement?

Objecting is the way to tell the Court what you don't like about the Proposed Settlement. You can object only if you stay in the Class and don't exclude yourself.

Excluding yourself is the way to tell the Court you do not want to be a part of the Class and the Proposed Settlement, and that you want to keep the right to file your own lawsuit. If you exclude yourself, you cannot object because the Proposed Settlement no longer will affect you.

### YOUR RIGHTS AND CHOICES - APPEARING IN THE LAWSUIT

## 19. Can I appear or speak in this lawsuit and Proposed Settlement?

As long as you do not exclude yourself, you can (but do not have to) participate and speak for yourself in this lawsuit and Proposed Settlement. This is called making an appearance. You can also have your own lawyer speak for you, but you will have to pay for the lawyer yourself.

## 20. How can I appear in this lawsuit?

If you want to participate (or have your own lawyer instead of Class Counsel participate or speak for you) in this lawsuit, you must give the

Court a paper that is titled a "Notice of Appearance." The Notice of Appearance must contain the title of the lawsuit, a statement that you wish to appear at the Fairness Hearing and the signature of you or your lawyer.

Your Notice of Appearance can also state that you or your lawyer would like to speak at the Court's hearing on the Proposed Settlement. If you submit an objection (see question 17) and would like to speak about the objection at the Court's hearing, both your Notice of Appearance and your objection should include that information too.

Your Notice of Appearance must be signed, mailed and *postmarked by January 4, 2011*, to the Court at:

> Clerk of Court
> U.S. District Court
> Central District of California
> 411 West Fourth Street
> Room 1053
> Santa Ana, CA 92701-4516

Copies of your Notice of Appearance must also be signed, mailed, e-mailed, or faxed and *postmarked, or the equivalent for e-mail and fax, by January 4, 2011*, to the same addresses appearing in question 17.


## IF YOU DO NOTHING

### 21. What happens if I do nothing at all?

If you do nothing:

- You will stay a member of the Class and all of the Court's orders will apply to you.
- You will not get an e-credit. You will only be eligible to receive e-credits under the Settlement if you complete an electronic claim form with appropriate information.
- You won't be able to sue, or join a new lawsuit against HP, about the issues and claims in this lawsuit, ever again, unless you exclude yourself.


## THE LAWYERS REPRESENTING YOU

### 22. Do I have a lawyer in this case?

Yes. The Court has appointed lawyers to represent you and all Class Members. The Court has appointed the following law firms to represent the Class:

| **Kabateck Brown Kellner, LLP** | **Chitwood, Harley Harnes LLP** | **McNicholas & McNicholas** |
|---|---|---|
| Brian S. Kabateck | Gregory E. Keller | Patrick McNicholas |
| Richard L. Kellner | Darren T. Kaplan | 10866 Wilshire Blvd., Suite 1400 |
| 644 S. Figueroa Street | 2300 Promenade II | Los Angeles, CA 90024 |
| Los Angeles, CA 90017 | 1230 Peachtree Street, N.E. | Telephone: (310) 474-1582 |
| Telephone: (213) 217-5000 | Atlanta, GA 30309 | Facsimile: (310) 475-7871 |
| Facsimile: (213) 217-5010 | Telephone: (404) 873-3900 | |
| | Facsimile: (404) 876-4476 | |

Together, these lawyers are called Class Counsel. You will not be charged for these lawyers.

## 23. How much will lawyers for the Class Counsel be paid and how will they be paid?

Class Counsel will ask the Court to approve payment of attorneys' fees and expenses of no more than $2,750,000. Class Counsel also will ask the Court to award Mr. Baggett $2,500 and Mr. Young $1,000. Class Counsel will file their Fee Application with the Court on or before November 29, 2010. HP will pay the amounts awarded by the Court. The Proposed Settlement benefits won't be reduced by HP's payment of Class Counsel's attorneys' fees and expenses or any payments to the plaintiffs.

### THE COURT'S FAIRNESS HEARING

## 24. When and where will the Court decide whether to approve the Proposed Settlement?

The Court will hold a Fairness Hearing at 9:00 a.m. on **January 31, 2011**. This hearing date may be moved, cancelled or otherwise modified, so please check the settlement website at www.HPLaserJetPrinterSettlement.com regularly for further details. The Court is located at 411 West Fourth Street, Santa Ana, CA 92701-4516. At this hearing, the Judge will consider all objections, if any, and will consider whether the Proposed Settlement is fair, reasonable and adequate to the Class. The Judge will listen to people who have asked to speak at the hearing. The Judge may also decide how much to award to Class Counsel for their fees and expenses. At or after the hearing, the Judge will decide whether to approve the Proposed Settlement. We do not know how long these decisions will take.

## 25. Do I have to come to the hearing?

You don't have to come to the hearing. Class Counsel will answer questions the Court has. But you and/or your lawyer are welcome to come at your own expense. If you send an objection, you don't have to come to the hearing for the Judge to consider it.

## 26. Can I speak at the hearing?

You can ask the Court to allow you (or your lawyer) to speak at the hearing. To do so, you or your lawyer must file a Notice of Appearance that says you wish to speak. You can find how to file a Notice of Appearance, and the due date for filing, in question 20. If you submit an objection and wish to speak about it at the Fairness Hearing, you must include that information in your objection (see question 17).

You cannot speak at the hearing if you exclude yourself.

### GETTING MORE INFORMATION

## 27. Are more details about the lawsuit and the Proposed Settlement available?

This Notice only summarizes the lawsuit and Proposed Settlement. More details are in the complaints filed in these class actions and in the Settlement Agreement. You can get copies of these documents by visiting the Proposed Settlement website, www.HPLaserJetPrinterSettlement.com.

You can also look at all of the documents filed in the lawsuit at the Office of the Clerk, United States District Court, Central District of California, located at 411 West Fourth Street, Room 1053, Santa Ana, CA 92701-4516.

---

**28. How do I get more information?**

---

You can get more information and read common questions and answers by visiting the Proposed Settlement website, www.HPLaserJetPrinterSettlement.com.

(1) The definition of any capitalized terms not defined herein can be found in the Stipulation of Settlement found at the settlement website, which is located at www.HPLaserJetPrinterSettlement.com.

Please note that the content of this e-mail is intended for U.S. residents only.

HP Privacy Mailbox, 11445 Compaq Center Drive W., Mailstop 040307, Houston, TX 77070

--
Marc

www.priority-pediatrics.com
Priority Pediatrics on Facebook
Tell your Friends on Facebook about Priority Pediatrics & Dr. T
http://www.twitter.com/DrT_Atlanta

--
Marc
www.priority-pediatrics.com
Priority Pediatrics on Facebook
Tell your Friends on Facebook about Priority Pediatrics & Dr. T
http://www.twitter.com/DrT_Atlanta

**Exhibit C**

| | |
|---|---|
| **From:** | brinda@serafinatechnical.com |
| **To:** | Richard Kellner |
| **Subject:** | RE: object to settlement |
| **Date:** | Thursday, December 02, 2010 11:23:32 AM |

Hi,

As long as we can over-ride whatever prevents us from not using all the ink in the cartridges I am fine with the settlement.

Thank you for your response.

Brinda Ramanathan
Principal
Serafina Technical Consulting LLC
www.serafinatechnical.com
Phone 575-421-0124
Cell 505-617-0185

**From:** Richard Kellner [mailto:rlk@kbklawyers.com]
**Sent:** Thursday, December 02, 2010 11:41 AM
**To:** brinda@serafinatechnical.com
**Subject:** RE: object to settlement

**Dear Brinda:**

**Thank you for taking the time to express your opinion regarding the HP laserjet settlement.   When we received your email, we thought you may not have all the information about the proposed settlement and may want some more information.**

**I hope the following helps:**

- We commenced this class action in July of 2007, in response to what we believed to be HP's unfair business practice of designing its printers.
- In September 2009, the District Court dismissed our case and granted judgment in HP's favor.  We were forced to file an appeal in the Ninth Circuit Court of Appeals, where the case was pending when we reached the settlement.
- Our firms spent over 13,000 hours in time and almost $200,000 in costs to prosecute this case.  We traveled around the U.S. taking the depositions of scores of HP witnesses, reviewed hundreds of thousands of documents, interviewed hundreds of HP customers, and hired and worked with experts.
- While the appeal was pending and despite the fact we lost, we negotiated a settlement of the case.
- HP has agreed to an injunction that achieves most of the injunctive relief

that we originally asked the court to grant.

- As a result of this litigation, virtually all (if not all) of the future lines of HP color laserjet printers will not have the technology in them that prevents users of HP color laserjet printers from exhausting the toner in the cartridges that they purchased.  For all members of the *Young* class, which has technology that permits the user to "override" the hardstop, the settlement provides them with notice on the existence of the "override" and where the instructions for the "override" can be found.  For members of the *Baggett* class, we confirmed that HP could not change the technology of the printers/cartridges, and the most that they could do is provide notice of the situation in the class notice that has been sent to you.
- The settlement will affect millions of printers already in existence and many more to be manufactured in the future.  It will help to change the way printers are designed in the United States.
- With respect to the e-credits, there are certain items that can be purchased with the full credit (such as paper, etc.) – so the e-credits do provide some value.  While we would have liked to have obtained a greater monetary benefit for the class, the fact is that the case is on appeal.  Given that the case was on appeal, the primary benefit of this settlement remains the real injunctive relief and HP's changes in its business practices.

**I hope that this information provides you with a more complete understanding of this case.  While we would have liked to have gotten a larger e-credit for you and other class members, the procedural posture of the case provided us with limited leverage to get more e-credis.  However, we were able to get very substantial injunctive relief that not only material changed the way that HP does business in the future, but provides users with more information regarding their printers (that we believe should have been provided in the first instance).**

**Thank you again for the time you spent in sending your comments about the settlement.**

Richard L. Kellner / Partner
Historic Fire Engine Co. No. 28 Building
644 South Figueroa Street, Los Angeles, CA 90017
T 213.217.5000
www.kbklawyers.com

**Kabateck** Brown Kellner LLP

---

**From:** brinda@serafinatechnical.com [mailto:brinda@serafinatechnical.com]
**Sent:** Sunday, November 14, 2010 1:37 PM
**To:** info@HPLaserJetPrinterSettlement.com
**Cc:** Richard Kellner; Fcorrado@morganlewis.com; Khenning@morganlewis.com
**Subject:** object to settlement

Hello,

I bought three HP laser printers and numerous cartridges.  In my opinion, the e-credit does not cover the extra money I spent on cartridges since buying these laser printers  The e-credit should be based on the number of cartridges purchased since purchasing the printers.

Name: Brinda Ramanathan
Address P. O. Box 77, Serafina, NM 87569
e-mail: brinda@serafinatechnical.com
phone number: 575-421-0124

Brinda Ramanathan
Principal
Serafina Technical Consulting LLC
www.serafinatechnical.com
Phone 575-421-0124
Cell 505-617-0185

**Exhibit D**

Timothy P. Rumberger, Esq. State Bar #145984
**LAW OFFICES OF TIMOTHY P. RUMBERGER**
2161 Shattuck Avenue, Suite 200
Berkeley, California 94704-1313
Telephone: (510)841-5500
Facsimile:  (510)521-9700
e-mail: tim@rumbergerlaw.com

Attorneys for the Representative Plaintiffs
and the Plaintiff Class

IN AND FOR THE SUPERIOR COURT OF THE

STATE OF CALIFORNIA, COUNTY OF SAN FRANCISCO

| | |
|---|---|
| **MARTHA SUTHERLAND**, individually and on behalf of all those similarly situated, | **Case No. CGC 08-478150** |
| Plaintiffs, | **CLASS ACTION** |
| v. | **SECOND AMENDED COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION** |
| **HEWLETT-PACKARD COMPANY**, and Does 1 through 50, | |
| Defendants, | **JURY TRIAL DEMANDED** |

Representative Plaintiff alleges as follows:

## I.     PRELIMINARY STATEMENT

1.     This is a class action, brought on behalf of MARTHA SUTHERLAND (hereinafter "Representative Plaintiff") and all other persons similarly situated ("Class Members") who purchased Color LaserJet 2600n or one of the comparable model Hewlett-Packard printers and/or toner cartridges programmed by HP to require replacement prior to delivering full advertised yields.

2.     Defendant Hewlett-Packard Corporation ("HP" or "Defendant") is the world's leading manufacturer of laser printers, multi-function printing devices and printer supplies.

3.     HP's most profitable business is printer supplies, deriving 42% of its $2.63 billion quarterly operating profit from its Imaging and Printing Group, (nearly twice the amount contributed by the HP Personal Systems Group) according to an 11-20-2007 MS-NBC report.

*Law Offices of*
**TIMOTHY P. RUMBERGER**
2161 Shattuck Ave., Suite 200
Berkeley, California 94704
(510) 841-5500

**SECOND AMENDED CLASS ACTION COMPLAINT**

1

4.     This class action lawsuit addresses HP's practice of engaging in deceptive and unconscionable business conduct designed to multiply the sales of its new replacement toner cartridges to the detriment of, and at great cost to, consumers.

5.     California consumers, businesses, schools and NGOs were led by HP's extensive and successful marketing efforts to purchase a broad range of HP laser printers, including the *Color Laser Jet 2600n* (introduced in 2005), *Color Laser Jet 1518ni* (introduced in 2008) and comparable models.  Consumers were promised by HP and they agreed to pay for quality printers and toner cartridges that consistently deliver the full measure of HP's ***advertised yields*** while conducting normal and common printing activities (yields are stated as projected number of pages that can be obtained from a cartridge on average, based on 5% average pre-page toner coverage).  Consumers were also promised by HP to be automatically notified by "SureSupply" smart-chip toner level tracking and display technologies whenever cartridge yields have been fully delivered – with timely, accurate warnings to order and replace supplies.  All these representations appear on the packaging of related products, in retail point-of-sale literature, in the owners' manuals included on CDs and available on-line, and have continuously appeared on the HP web site at all relevant times.

6.     Instead, consumers were and continue to be consistently and deliberately misled to believe by HP's "SureSupply" that some or all of the toner cartridges have been depleted, ***when in fact these cartridges have not yet delivered anywhere close to the full page yields advertised by HP*** – while they still contain most of their usable toner and are able to produce thousands of quality printed pages.  Furthermore, these HP toner cartridges are ultimately "hard-stopped" by HP technologies, unlawfully preventing consumers from receiving the full benefit of advertised page yields based on ***actual average toner coverage*** being utilized by consumers.  Consumers are consistently instructed by HP technologies to unnecessarily order and replace supposedly depleted

*Law Offices of*
TIMOTHY P. RUMBERGER
2161 Shattuck Ave., Suite 200
Berkeley, California 94704
(510) 841-5500

2

**SECOND AMENDED CLASS ACTION COMPLAINT**

cartridges with new HP cartridges, in a blatant contradiction of promises made by HP's advertised

yield specifications and HP's advertisements of overall efficiency of its printing products.

7.      *The key allegation and the legal theory of this class action litigation is NOT based on the evidence of some small quantity of toner being left unused inside HP cartridges after "hard-stop" by HP technologies* (because such leftover toner might in fact be legally legitimate "spare toner"). *Rather, the focus of* <u>Sutherland v. HP</u> *is the extensive and incontrovertible body of evidence proving that HP printers and toner cartridges are deliberately programmed to prevent the delivery of most of their advertised page yields under common and normal printing conditions in order to accelerate HP's highly profitable cartridge replacement business.*

8.      Plaintiff contends and a comprehensive body of evidence shall prove that:

a)   The actual operation of HP laser printers, as experienced by consumers during common and normal printing tasks, consistently *delivers only a small fraction of advertised page yields based on 5% average coverage for color and/or black cartridges, while needlessly wasting much of their usable toner*;

b)   HP deliberately programs its laser printers to use a variety of visual means of communications (flashing LED lights, LCD screens displaying toner level gauges and text messages, printed supply status pages, PC-based utility software and printer-based status display web pages) to *mislead consumers about the remaining toner levels and/or the expected remaining cartridge life*, falsely indicating cartridges are being gradually depleted (or have been fully depleted), when in fact they (i) have not delivered anywhere near their advertised yields, (ii) have not been depleted, (iii) are still substantially full of usable toner, and (iv) are fully able to print quality pages;

c)   HP intentionally implemented technologies to prevent consumers whose HP cartridges were "hard-stopped" from obtaining their full advertised page yields;

*Law Offices of*
TIMOTHY P. RUMBERGER
2161 Shattuck Ave., Suite 200
Berkeley, California 94704
(510) 841-5500

3

**SECOND AMENDED CLASS ACTION COMPLAINT**

d) Despite a multitude of requests made to HP's tech support staff and HP's counsel by consumers and concerned citizens, including providing HP with extensive evidence of its printers' consistent failures to deliver full advertised yields (often blocking over 80% of their color toner yields), *and despite HP own engineers' repeated spoken and published admissions of these known defects and promises to correct them (Exhibits 7, 8 and 9), HP continues this deliberate deception* in a broad range of its legacy and current printers and replacement toner cartridges;

e) The above allegations are not only based on the personal experiences of the Plaintiff and many other class members (disgruntled HP customers who provided their HP printers and "hard-stopped" HP cartridges for the investigation), but *these allegations have been fully confirmed under controlled conditions by a scientific study of yield delivery by HP Color LaserJet printers*. This study empirically determined that HP products are deliberately designed and programmed to consistently mislead and defraud consumers by failing to provide the full measure of advertised yields, costing them almost $300 per incident. (**Exhibit 1**)

9. HP's business misconduct over at least the last six years constitutes a massive consumer fraud, estimated to cost consumers, businesses as well as government and nonprofit organizations in California – and world wide – multiple billions of dollars in needless cartridge purchases, as well as millions of man-hours of lost productivity wasted on needlessly interrupted printing and unnecessary shopping for, installing and recycling perfectly good toner cartridges.

10. This fraud is perpetrated by HP in order to extract massive unlawful profits from the sales of unnecessary new HP replacement toner cartridges. It also causes millions of perfectly good toner cartridges to be needlessly discarded into landfills or unnecessarily recycled. HP thereby has created and continues creating a substantial waste of toner, plastic, metal, packaging and energy,

*Law Offices of*
TIMOTHY P. RUMBERGER
2161 Shattuck Ave., Suite 200
Berkeley, California 94704
(510) 841-5500

4

SECOND AMENDED CLASS ACTION COMPLAINT

while contributing to the environmental pollution and unproductive $CO_2$ emissions from manufacture and transportation of these toner cartridges.  This intentional and egregious waste of toner, cartridges and packaging blatantly violates HP's own published contract with the public spelled out in HP's Standards of Business Conduct, as well as in a broad range of published advertising promoting HP as one the most honest and environmentally responsible corporations.

11.    This lawsuit is brought on behalf of classes of California consumers who, at any time since August 1, 2004, purchased in California and were residents of California at the time when they purchased HP laser printers and/or new HP replacement cartridges containing various toner consumption tracking technologies that "hard-stop" printing, and seeks various remedies, including:

a)    Pursuant to Civil Code §1770 an injunction prohibiting HP from selling any printers and replacement cartridges containing deceptive supply management features;

b)    Pursuant to Business and Professions Code §17200 and §17500, orders including, but not limited to, payment of restitution for all the losses suffered by the classes and disgorgement to the classes of all profits traceable to the monies paid by the classes to HP and/or made by HP as a result of the unlawful activities;

c)    Orders requiring HP to pay restitution damages based on HP's breach of its express warranties to classes who suffered losses caused by the deceptions perpetrated by HP advertising and technologies;

d)    Orders requiring HP to either recall the offending products, or issue and promote a software and/or firmware upgrade for the HP printers already in use by consumers, such that it effectively removes any deceptive technologies and/or prevents these printers from reporting false remaining supplies readings and/or prevents these printers from "hard-stopping" the use of cartridges prior to delivering their full advertised page yields to consumers while still containing usable toner or ink.

*Law Offices of*
**TIMOTHY P. RUMBERGER**
2161 Shattuck Ave., Suite 200
Berkeley, California 94704
(510) 841-5500

5

**SECOND AMENDED CLASS ACTION COMPLAINT**

12.     In the event HP refuses and/or fails to correct the yield under-delivery as a result of premature "hard-stopping" of cartridges or to change its yield-marketing representations, Plaintiffs further seek injunctive relief prohibiting HP from selling the challenged printers and/or cartridges apart from simultaneous, proper disclosure that these laser printers and cartridges are programmed to consistently and deliberately block most of their promised page yields and deliberately distort the ISO yield specifications system utilized by the entire printer industry -- frequently wasting most of their usable toner whenever HP's cartridge replacement recommendations are followed.

## II.     PARTIES

13.     Representative Plaintiff *Martha Sutherland*, a natural person, is a resident of San Francisco, California, who purchased two HP Color LaserJet 2600n printers in 2005 and 2006, and for which she has purchased numerous sets of new Q6000 series HP replacement toner cartridges.

14.     Class members are residents of California who, at any time from August 1, 2004 to the present, purchased HP laser printers and/or HP replacement cartridges containing various toner consumption tracking technologies that hard-stop printing prior to delivering their advertised yields.

15.     As used throughout this Complaint, the term "Class Members" refers to the Representative Plaintiff(s) herein as well as each and every person eligible for membership in the class of persons as further described and defined herein.

16.     At all times herein relevant, the Representative Plaintiff(s) were and are now persons within the classes of persons further described and defined herein.

17.     The Representative Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to California Code of Civil Procedure §382, on behalf of all persons similarly situated and proximately damaged by the unlawful conduct described herein.

18.     Defendant *Hewlett Packard Company* ("HP") is a public corporation with worldwide corporate headquarters located in Palo Alto, California.

*Law Offices of*
TIMOTHY P. RUMBERGER
2161 Shattuck Ave., Suite 200
Berkeley, California 94704
(510) 841-5500

6

**SECOND AMENDED CLASS ACTION COMPLAINT**

### III.   SUBSTANTIVE ALLEGATIONS

19.     Between 2004 through 2008, HP sold the *Color LaserJet 2600n* printer in California, retail priced between $499 and $299.  The HP *Q6000* series replacement toner cartridges used by the *Color LaserJet 2600n* (as well as numerous compatible printer models) cost between $80 and $95 plus tax and shipping each, totaling close to $400 for a full set of four separate toner cartridges required to operate the printer (black, cyan, magenta and yellow) – roughly the same price as a new printer with these same cartridges included in the package.

20.     The HP product line contained and still contains numerous laser printers and multi-function devices that operate in a substantially similar manner to the HP Color LaserJet 2600n (such as the CP-1518ni printer), which is illustrative and representative of the numerous HP laser printer models covered by this class action and that shall be identified during the discovery process.

21.     The HP Color LaserJet 2600n printer (and the four Q6000 series toner cartridges required to operate it) contain technologies that purport to accurately track and communicate to consumers the remaining amount of toner over the lifetime of each cartridge, using embedded memory chips (known as "smart-chips"), as well as HP firmware, driver and utility software operating inside printers and PCs.  HP markets these technologies under a **"SureSupply"** brand, advertising to consumers that with the help of these "HP innovations" they will be assured of perfect printer performance, as well as simplified and timely ordering of HP replacement cartridges, thus being protected from running out of toner while trying to complete printing tasks, or wasting efforts, paper and good toner on partially faded or spotted pages.  (**Exhibit 2**)

22.     HP printers collect and use data saved inside cartridge smart-chips to provide consumers with convincing-looking visual indications of the remaining toner levels for each of the cartridges (using color-coded bar-charts on the printers' built-in LCD screens, and/or windows and/or printouts produced via software running on personal computers), including messages

**SECOND AMENDED CLASS ACTION COMPLAINT**

warning consumers that the levels of remaining toner are getting low and that new cartridges should be ordered. HP technologies subsequently block further printing entirely (a.k.a. "hard-stop"), instructing consumers to replace cartridges, which HP software claims to be depleted via a bar-graph showing toner having been fully depleted and a **"Replace supplies"** message on the printers' LCD screens and/or utility/driver software on the consumers' PCs. **(Exhibit 3)**

23.    This legal action alleges and shall prove that instead of benefiting consumers, this combination of HP hardware and software toner tracking technologies (marketed under HP's SureSupply brand) has proximately caused Plaintiff and the class to suffer damages by:

a)   misleading consumers using convincing color-coded bar-graphs into falsely believing that the toner is running low or that toner has been fully depleted when in fact the cartridges have not yet delivered their full page yield(s) and are still substantially full of usable toner and able to print quality pages; and thereby,

b)   causing consumers to purchase unnecessary HP replacement toner cartridges prior to delivering full advertised page yields from one or more of the four cartridges required to operate an HP color laser printer;

24.    HP has advertised and continues to advertise in print, including point-of-sale brochures, product packaging, documentation and specifications, as well as on its website the *expected (projected) average page yields for the specific models of HP toner cartridges, based on an average 5% per-page toner coverage for each cartridge*, consistently with the International Standards Organization (ISO) published test procedures.    **(Exhibit 4)**

( THIS SPACE LEFT DELIBERATELY BLANK)

*Law Offices of*
TIMOTHY P. RUMBERGER
2161 Shattuck Ave., Suite 200
Berkeley, California 94704
(510) 841-5500

8

SECOND AMENDED CLASS ACTION COMPLAINT

25.     Specifically, consumers are consistently led to believe by HP that they will be paying only for the toner they actually use on their printed pages and that they will obtain full advertised page yields based on average per-page toner coverage during common and normal printing activities. [1] In HP's own words on page 92 of HP 2600n User's Manual (in print and on-line):

> *"The life of a print cartridge depends on the amount of toner that print jobs require.*
> *When printing text at approximately 5% coverage, a cyan, magenta, or yellow print*
> *cartridge for the HP Color LaserJet 2600n printer lasts an average of 2,000 pages,*
> *and a black print cartridge lasts an average of 2,500 pages.*
> *A typical business letter has 5% coverage."*

26.     HP's per-cartridge yield advertisements for color laser printers utilizing a total of four cartridges (black, cyan, magenta and yellow – mixed to produce full color images) do not make any additional disclosures about their expected operation.  Specifically, HP does not warn consumers that the use of toner in color cartridges may not be deferred indefinitely when printing mostly monochrome (i.e. black only) documents because cartridges that are consistently under-utilized may be "hard-stopped" by HP's SureSupply system prior to delivering their full advertised yields; nor does HP disclose any mechanical life limits for cartridges based on their age or page-counts that may cause failure to deliver full advertised yields while still substantially full of toner.[2]

---

[1]   The *"projected page yield based on stated average toner coverage"* method of cartridge life advertisement *does NOT state a maximum or even a set actual number of pages expected to be printed by a particular cartridge model under all circumstances, but rather it is a formula,* or a specific relationship that inversely links the number of pages that can be printed on average, with the average percentage coverage of toner per page actually being printed by a particular consumer.  This definition of yield based on coverage is consistent across the entire laser printer industry.

[2]   According to *"projected page yield based on 5% average coverage"* advertisements, as correctly noted by HP: *"Actual yields may vary according to usage"* – i.e. the more toner a consumer may use per page, the fewer actual pages can be printed with a cartridge, while on the other hand, should a consumer use less of a particular color toner per page, on average, the consumer will then be able to print more pages with that color cartridge.  Thus, a particular toner cartridge model advertised as having a *"2,000 page yield based on average 5% coverage per page,"* constitutes a *projected yield* promise that must result in an *actual yield* of only 400 pages per cartridge when using an average 25% of that toner coverage per page (for example while printing full-color fliers or postcards) thus obtaining only 1/5[th] of the typical yield when increasing the average actual toner coverage per page by a factor of 5.  Similarly, the advertised *"2,000 page yield based on average 5% coverage per page,"* also corresponds to an *actual yield* of over 10,000 pages when, for example, printing a batch of blank letterheads with an actual average coverage of less than 1% per-page (thus obtaining at least 5X the *advertised yield* when the *actual average toner coverage* per page is less than 1/5[th] of the coverage specified by that *advertised yield*).

*Law Offices of*
TIMOTHY P. RUMBERGER
2161 Shattuck Ave., Suite 200
Berkeley, California 94704
(510) 841-5500

SECOND AMENDED CLASS ACTION COMPLAINT

9

reliance on sales staff's answers and explanations regarding the expected performance and total costs of ownership of the CLJ 2600n printer, including its claimed ability to print primarily black documents without wasting color toner that might be used only for occasional color printing.

32.    After Plaintiff started to use her HP printers, she was informed by HP's technologies that all of her toner cartridges were being gradually depleted and she was eventually "hard-stopped" from further printing and instructed to purchase and replace all four toner cartridges, costing close to $400 for a full set.  New HP replacement cartridges were purchased by Plaintiff on numerous occasions from an OfficeMax store in San Francisco and a Staples store in New York, from 2006 to the present.  All three of the above mentioned retail stores were HP's authorized resellers, as well as HP marketing partners at the time the Plaintiff made her purchases.

33.    Plaintiff, as a typical consumer, did not have any knowledge of HP printers' actual design and actual operating parameters because they were not disclosed in any marketing materials or documentation (i.e. 2600n printers having been designed to display false remaining toner levels on their LCDs prior to delivering full advertised yields), nor did HP provide Plaintiff with any way to visually inspect the true levels of remaining toner in her cartridges.  Having "hard-stopped" her cartridges after consistently showing their toner levels being gradually depleted over the course of a few months, the printer's LCD screen did not offer Plaintiff an option to "override" the "Replace supplies" instructions it presented, which included a demand to replace all of her color cartridges at the same time.  Therefore, Plaintiff reasonably relied on HP's representations that the cartridges had fully delivered their promised yields, were indeed fully depleted and had to be replaced.

34.    In reliance on HP's communications on her CLJ 2600n's LCD screen, Plaintiff purchased a full set of new HP replacement cartridges – exactly as she was instructed to do by HP.  Even if Plaintiff had already discovered how to override the "hard stop" condition, she would not have done so in further reliance on HP's emphatic written warnings that such operation would likely lead to poor quality output, wasted supplies and would *void warranties*.  (Exhibits 6 and 3)

35.    In January 2008, Plaintiff sought the services of a technology consultant when her 2600n printer "hard-stopped" a set of cartridges that she was quite certain had not yet delivered

Law Offices of
TIMOTHY P. RUMBERGER
2161 Shattuck Ave., Suite 200
Berkeley, California 94704
(510) 841-5500

11

SECOND AMENDED CLASS ACTION COMPLAINT

27.     Therefore, HP communications implicitly lead consumers to believe that when printing only monochrome pages, none of the advertised color cartridge yields are being consumed at all because the average color coverage while printing monochrome pages equals to zero, and, therefore, consumers can expect the cost of printing monochrome pages on a color laser printer to be equivalent to that of a similar quality monochrome laser printer.

28.     Moreover, when questioned about cartridge yields, toner utilization and operating costs expectations for HP color laser printers, HP's tech-support and pre-sales technicians available by phone, as well as sales clerks at HP-authorized national office-supply retail stores (including CompUSA, Office Depot, OfficeMax and Staples) fully and consistently confirm HP's published explanations and consumer's expectations described herein  (CompUSA shut down operations in 2007, other three retailers are presently HP's marketing partners for printers and cartridges).

29.     In addition to directly advertising its products and their performance characteristics, HP has also engaged and continues to engage in extensive brand promotion designed to induce consumers and businesses to trust its brand and choose its printing products over those of its competitors.  As part of these promotions, HP's **Standards of Business Conduct** (SBC) published on the internet and in printed form, starting in 2006 and through the present time, pledges:

    a) HP's total commitment to serving its customers' best interests;

    b) HP always being truthful and complete in all of its communications;

    c) HP always conducting business in total integrity, as well as

    d) HP consistently preventing waste of materials and energy while maximizing efficient use, reuse and recycling of its products.  **(Exhibit 5)**

30.     HP had the technologies and the know-how to provide substantially accurate toner level reports and remaining yield projections to consumers – consistent with HP's advertising and Standards of Business Conduct – but chose not to do so.

31.     Plaintiff Martha Sutherland's decision to purchase two HP Color LaserJet 2600n printers in 2005 and 2006 was based on extensive research about numerous available brands and models of laser printers, including a comprehensive review of HP product specifications and

*Law Offices of*
TIMOTHY P. RUMBERGER
2161 Shattuck Ave., Suite 200
Berkeley, California 94704
(510) 841-5500

SECOND AMENDED CLASS ACTION COMPLAINT

10

anywhere close to their advertised page yields based on 5% average coverage.  At that time Plaintiff

learned from her consultant about the existence of an "override mode" together with HP's

accompanying warnings of imminent quality problems, waste of supplies and voided warranties.

36.    In fact, HP's instructions regarding this obscure and deliberately complex procedure

for activating the "override mode" were replete with multiple warnings that its use would be

dangerous and could damage HP printers, while any related problems would not be covered by

HP's warranties -- all with the effect of inducing Plaintiff's reliance and further impeding her from

obtaining the full value of cartridge page yields advertised by HP.

37.    Frustrated by the dilemma HP forced upon her (to cripple valuable printer

functionality and void warranties in order to be able to obtain the full measure of advertised

cartridge yields), Plaintiff complained to HP's "Corporate Escalation Response Team" whose

technical support staff admitted that this "hard-stop" of substantially full and perfectly functional

cartridges resulted from a "known defect" for which HP engineers even had a nickname – the "11%

bug." (**Exhibit 7**)  Plaintiff was then promised that this defect would be cured with a new full set of

four Q6000 replacement cartridges combined with a firmware/software upgrade applied to her

printer.  However, despite the installation of all the firmware and driver software upgrades

recommended by HP, the Plaintiff's 2600n printer continued to operate in the same inefficient and

deceptive manner – no differently from her second 2600n printer that was not upgraded.

38.    Indeed, had HP printers been designed to accurately track toner use and to

recommend cartridge replacement only after they have truly delivered their advertised page yields

(or used up their "full yield toner weight"), then an "override mode" feature would be unnecessary

as there would be truly no yield capacity left, and the only remaining toner would be a small amount

of "spare toner" rather than a large portion of the "full yield toner."  As such, the very existence of

an "override mode" evidences that HP knew that a substantial part of advertised yields might not be

delivered to consumers prior to "hard-stop," and it tried to create legal loophole for its misconduct.

39.    Moreover, the utilization of the "override mode" deprives Plaintiff and consumers of

advertised benefits they agreed to purchase from HP, including printers' valuable advertised ability

*Law Offices of*
TIMOTHY P. RUMBERGER
2161 Shattuck Ave., Suite 200
Berkeley, California 94704
(510) 841-5500

12

SECOND AMENDED CLASS ACTION COMPLAINT

to (i) detect full yield delivery and true toner depletion (promoted by HP as a "no-shake" cartridge design) and to (ii) provide consumers with accurate and timely warnings to order and then install replacement cartridges.  Once the "override mode" is activated, HP printers stop providing any information about supplies status, thus losing this key part of their highly beneficial functionality originally promised to consumers.  When any cartridge is "hard-stopped" prior to the delivery of full advertised yields, under HP's own warranty terms (as well as HP's admissions made to the Plaintiff) the need to activate "override mode" in order to obtain full stated yields *constitutes a fundamental product defect and is not a legitimate or reasonable mode of product utilization*.

40.     The Plaintiff, as well as numerous other class members /consumers, businesses, law firms and a non-profit organization (Integrity Capitalism Network – ICN) provided HP with ample evidence from numerous disgruntled HP customers and made numerous appeals to HP through 2009 to correct the above described defects and terminate the alleged frauds, including sharing with HP a video documenting the ICN investigation (**Exhibits 8 and 11**).  However, while HP tech support and engineering staff admitted that the above described product defects exist (**Exhibits 7 and 9**), HP has failed to correct them.  Therefore, the Integrity Capitalism Network volunteers undertook to develop, execute and film a meticulous scientific study in order to investigate under controlled settings the full extent of the alleged HP yield delivery defects and frauds. (**Exhibit 1**)

41.     First, in the course of extensive interviews with HP's sales agents, this study fully confirmed that, consistent with the Plaintiff's experience, when questioned about cartridge yields, toner utilization efficiency and operating costs for color laser printers, HP fully and consistently confirmed the above-described published explanations as well as consumers' expectations – through telephone and web communications by HP's tech-support and pre-sales technicians, as well as in person by the sales clerks at HP-authorized national office-supply retail stores (Office Depot, OfficeMax and Staples).

42.     Then, this HP yield verification study ran tests and performed measurements on multiple Color LaserJet 2600n printers as well as HP's 2008 CP1518ni model that replaced 2600n. These coprehensive, yet straightforward tests (based in part on ISO test templates specified by HP,

**SECOND AMENDED CLASS ACTION COMPLAINT**

as well as typical real-world utilization patterns) provided consistent results that can be readily replicated by HP management, any qualified engineering professionals or university researches and even students.  In short, ICN's HP toner yield study empirically proved that the above described allegations made by the Plaintiff and numerous other consumers based on their personal experiences were indeed fully accurate, and that HP SureSupply technologies do indeed consistently block the consumption of more that 80% (!!) of advertised cartridge yields during normal and common printer utilization scenarios, needlessly wasting most of the "full-yield toner" purchased by consumers, thus causing them substantial financial losses.

43.    The methodology and the conclusions of this study have been thoroughly reviewed and endorsed by one of the most respected research scientists, Stanford University Professor Emeritus, Dr. Phil Zimbardo.  A full report of this study is presently being made available by ICN to HP counsel and management and will also be introduced into evidence by this Plaintiff at an appropriate stage of the proceedings.

( THIS SPACE LEFT DELIBERATELY BLANK)

SECOND AMENDED CLASS ACTION COMPLAINT

### IV.  CLASS ACTION ALLEGATIONS

44.    Plaintiff brings this legal action on behalf of the following Classes and Sub-Classes that purchased HP printing products within four years of the date the original complaint in this action was filed:

**Class A**:

(i) All California consumers (consumers, as used herein means any individuals who seek or acquire, by purchase or lease, any goods or services for personal, family or household purposes) who purchased HP laser printers and/or HP new replacement toner cartridges – these printers and cartridges having the following properties:

(a) toner cartridges are permanently "hard-stopped" from further printing once they reach supplies-out condition as defined by HP,

(b) printers contain an LCD supplies status display that offers text instructions to order and/or replace toner cartridges and/or contain an LED light for indicating a "supplies-out" and/or "replace supplies" condition as defined by HP, and

(c) they **DO HAVE** an "override mode" capability for enabling continued printing after toner cartridges had been "hard-stopped" by HP technologies;

(ii) All such consumers who purchased HP laser printers and/or HP new replacement toner cartridges – these printers and cartridges having the following properties:

(a) and (b) as described above,  and   (c) they **DO NOT HAVE** an "override mode" capability.

**Class B**:

All other legal persons who are citizens of California (individuals, corporations, partnerships,  i.e. any individual or legal entity) as specified above in **Class A,** with matching subclasses (i) and (ii) as described above.

Plaintiff reserves the right to modify the Class description(s) and the Class period(s) based on the results of discovery.

*Law Offices of*
TIMOTHY P. RUMBERGER
2161 Shattuck Ave., Suite 200
Berkeley, California 94704
(510) 841-5500

15

**SECOND AMENDED CLASS ACTION COMPLAINT**

45.     Plaintiff does not know the exact number of Class A and Class B members because such information is in the exclusive control of defendant.  However, due to the nature of the trade and commerce involved, Plaintiff believes that the members of both Classes are sufficiently numerous and geographically diverse that joinder of all members of each Class is impracticable.

46.     There are questions of law or fact common to each Class, including but not limited to:

a)   Whether the Defendant has undertaken a common business practice of producing, marketing and selling to the public laser printers contain technologies that falsely indicate that the toner level is getting low and that the cartridge requires replacement when in fact they have failed to deliver advertised yield(s) based on 5% coverage;

b)   Whether Defendant adequately disclosed this design feature or condition, and/or concealed the fact that the printers and cartridges would perform in this manner;

c)   Whether Defendant's use of advertising and other representations constitute unfair competition and/or unfair, deceptive, untrue or misleading advertising;

d)   Whether Defendant engaged in unfair, unlawful and/or fraudulent business practices;

e)   Whether Defendant failed to disclose material facts about the subject HP printers and cartridges that Defendant had an obligation to disclose;

f)   Whether Defendant breached the implied covenant of good faith and fair dealing with Plaintiff and each Class;

g)   Whether members of each Class are entitled to damages including repair of defect(s), restitution, disgorgement of profits, and/or injunctive relief, and the proper measure, nature and extent of such relief;

h)   Which HP laser printers and toner cartridges contain memory chip toner tracking technologies that "hard-stop" printing;

i)   Whether all members of Class A and Class B are governed by the same law except for the CLRA based cause of action which only involves individual consumers;

**SECOND AMENDED CLASS ACTION COMPLAINT**

47.     These common questions and others predominate over questions, if any, that affect only individual members of each Class.

48.     Plaintiff's claims are typical of, and not antagonistic to, the claims of the other members of each Class because Plaintiff, by advancing her claims, will also advance the claims of all members of each Class, and because HP participated in activity that caused members of each Class to suffer substantially similar injury.

49.     Plaintiff and her counsel will fairly and adequately protect the interests of absent members of each Class.  There are no material conflicts between Plaintiff's claims and those of absent Class members that would make class certification inappropriate.  Counsel for Plaintiff is experienced in complex class action litigation, including consumer litigation, and will vigorously assert Plaintiff's claims and those of the members of each Class.

50.     A class action is superior to other methods for the fair and efficient resolution of this controversy, presenting fewer management difficulties, and providing the benefit of a single adjudication, economy of scale, and comprehensive supervision by a single court.

51.     Whatever difficulties may exist in the management of the class action will be greatly outweighed the benefits of the class action procedure, including but not limited to providing members of both Classes with a method for the redress of claims that may not otherwise warrant individual litigation.

( THIS SPACE LEFT DELIBERATELY BLANK)

SECOND AMENDED CLASS ACTION COMPLAINT

# FIRST CAUSE OF ACTION
## Breach of Express Warranty
### (On behalf of Class A and Class B)

52.     Plaintiff repeats the allegations set forth in sections I–III above as if fully contained herein.

53.     To prevail in a Breach of Express Warranty claim, Plaintiffs in California courts must show that:

    a)   *the seller's advertising statement(s) amount to an affirmation of fact or promise relating to the goods sold;*

    b)   *the affirmation or promise was part of the basis of the bargain, and*

    c)   *the seller breached the warranty.*

54.     HP's advertisements, written representations, web pages, as well as labels on the retail printer and cartridge packaging all consistently stated that the toner cartridges will deliver a certain page yield (for the HP CLJ 2600n printer and Q6000 series cartridges it was 2,500 pages for black and 2,000 pages for each of the color toner cartridges) based on the average 5% coverage per page.  Representations on HP printer and cartridge packaging were uniform labels approved by HP, therefore, they express warranties by HP as to the amount of printed pages Plaintiff can count on obtaining based on the amount of color coverage she was printing on an average page.

55.     When considering their purchases of HP laser printers and replacement toner cartridges, Plaintiff and the Classes relied on the honesty and completeness of HP's "yield disclosures," and these promises have indeed formed a part of the basis of the bargain between Plaintiff and HP.  The Plaintiff and the Classes fully expected that, as part of the bargain, for the moneys they spent on HP printers and supplies, in HP's own words *"The life of a print cartridge depends on the amount of toner that print jobs require,"* and, therefore, they anticipated using toner efficiently, including being able to obtain greater *actual page yields* when being frugal with the *average color toner coverage per page*, as discussed herein above (i.e. each color cartridge being expected to deliver an actual yield based on the actual average per-page coverage of that color, unlike, for example, the older, wasteful inkjet printers combining all the color inks into a single

Law Offices of
TIMOTHY P. RUMBERGER
2161 Shattuck Ave., Suite 200
Berkeley, California 94704
(510) 841-5500

18

SECOND AMENDED CLASS ACTION COMPLAINT

cartridge that had to be replaced whenever any one of the color inks had been depleted, while wasting all the remaining colors).

56.    HP breached its warranties by programming its printers to display convincing color-coded bar-graphs to falsely indicate that the toner is gradually being depleted when in fact, under many common and normal printing circumstances toner is not being depleted, or is being depleted at a much lower rate than indicated, and programming these printers to "hard-stop" printing and instruct consumers to replace toner cartridges at the time when they have not yet delivered their full advertised page yields based on actual average coverage and when cartridges still contain most of their "full yield toner weight".  As a result, under common and normal printing conditions, consumers are able to obtain only a small fraction of the full page yields promised by HP.

57.    HP intended and intends to breach its warranties by advertising yields based on 5% coverage for their color laser printers and cartridges that HP knew and knows to be substantially false because HP fails to inform consumers that when they print mostly black pages, as many consumers often do, their utilization of color toner is not in fact being deferred for future use as would be expected from HP's yield promises, and as fully confirmed by HP internal and external sales agents, but instead their utilization of color toners is being deliberately "hard-stopped" and wasted by HP's technologies.

58.    HP further breached warranties by requiring the use of "override mode" under common and normal printing conditions in order to obtain the full measure of advertised yields, which actually disables highly valuable printer functions and voids all warranties, thus rendering HP printers crippled and defective upon activation of this "override mode" (if activating it is required prior to the full delivery of advertised yields in order to obtain them).

59.    HP's breach of warranties caused substantial damages to Plaintiff and the Classes in the amounts to be shown at trial, including, but not limited to, causing them to waste many hundreds of dollars on unnecessary new HP replacement color cartridges, with the amount of suffered losses being proportional to the amount of deliberately blocked portions of the stated page yields, as well as causing Plaintiff and the Classes substantial loss of productivity and/or causing the

Law Offices of
TIMOTHY P. RUMBERGER
2161 Shattuck Ave., Suite 200
Berkeley, California 94704
(510) 841-5500

**SECOND AMENDED CLASS ACTION COMPLAINT**

Plaintiff and the Classes to incur technical consulting services expenses on addressing the stated defects and/or to unnecessarily shop for, install and recycle replacement toner cartridges.

### SECOND CAUSE OF ACTION
### Fraudulent Concealment
### (On behalf of Class A and Class B)

60.    Plaintiff repeats the allegations set forth above as if fully contained herein.

61.    To prevail in a Fraudulent Concealment claim, Plaintiffs in California courts must show that:

a)    *defendant had known but failed to disclose or concealed material fact(s) with an intent to defraud the plaintiff during a transaction;*

b)    *defendant had a duty to disclose these facts if the defendant took steps to hide material fact(s) from the plaintiff, or if the failure to disclose was "contrary to a representation actually made," or if the disclosed facts are misleading unless more information is provided, or if the defendant is aware of material facts and knows the plaintiff is unlikely to discover them;*

c)    *plaintiff was unaware of these facts and would not have acted as he did if he had knowledge of these facts;*

d)    *plaintiff sustained damages as a result of the concealment.*

62.    In the present case HP knew, but concealed from consumers to their detriment, that under common and normal printing conditions HP color laser printers utilize convincing-looking color-coded bar-graphs to show toner level to be low or depleted on their built-in LCD screens, the supplies status pages and the printer utility software running on personal computers, when in fact toner cartridges might be substantially full and have not yet delivered their advertised yields based on 5% average coverage per page. **(Exhibits 1, 8, 9 and 11)**

63.    HP knew, but concealed from consumers to their detriment, that HP printers are programmed to subsequently "hard-stop" the printing process, permanently disabling perfectly good cartridges, and instruct consumers to "Replace supplies" when in fact under common and normal

*Law Offices of*
TIMOTHY P. RUMBERGER
2161 Shattuck Ave., Suite 200
Berkeley, California 94704
(510) 841-5500

20

SECOND AMENDED CLASS ACTION COMPLAINT

1  printing conditions these cartridges have not yet delivered their advertised page yields based on 5%

2  average coverage per page (or have not yet consumed their "full-yield toner weight").

3      64.    HP knew, but concealed from consumers to their detriment, that under common and

4  normal printing conditions, in order to obtain the full advertised yields, they would have to resort to

5  learning how to use a complicated "override mode" which enables continued printing (using the

6  substantial remaining actual yield capacity and the "full-yield toner weight") after cartridges are

7  "hard-stopped," which, however, voids HP warranties and can lead to poor quality output and

8  wasted supplies.  The above key facts notwithstanding, HP further failed to program its printers to

9  offer the option to activate this "override mode" as an alternative response to the "Replace supplies"

10  instruction, nor did HP ever mention this feature anywhere near the yield explanations in its product

11  documentation, because HP knew that consumers would be unlikely to even inquire or learn about

12  this "feature," having trusted HP printers' misleading graphic and verbal communications indicating

13  that cartridges have been gradually depleting and/or have been fully depleted – when in fact they

14  were not.

15      65.    Furthermore, HP knew, but concealed from all affected consumers to their detriment

16  that having to activate "override mode" in order to obtain full advertised yields does in fact render

17  their printers crippled and defective, according to HP's own advertising and warranty policies.

18      66.    HP was fully informed about all the above described defects in its printing products,

19  at the very least based on the multitude of complaints and lawsuits it received from disgruntled

20  consumers over the past four years, and HP tech-support staff eventually admitted to a small

21  number of consumers, including Plaintiff, that these issues were caused by "known defects."

22  Specifically, HP knew that under common and normal printing conditions the advertised cartridge

23  yields, the toner utilization explanations and the visual communications about the remaining toner

24  levels are in fact partially or entirely false.  Therefore, HP had a duty to disclose all of the above

25  described material facts because they contradict representations HP actually made and continues to

26  make to Plaintiff and the Classes in its broad range of marketing content, technical specification

27

28

*Law Offices of*
TIMOTHY P. RUMBERGER
2161 Shattuck Ave., Suite 200
Berkeley, California 94704
(510) 841-5500

21

SECOND AMENDED CLASS ACTION COMPLAINT

documents, as well as in HP printers' remaining toner level displays and the "Replace Supplies" instructions.

67.    Further, HP had a duty to disclose all of the above described material facts because HP's yield advertisements are misleading to consumers unless HP also disclosed that HP cartridges typically block the delivery of the full advertised "projected page yields based on average 5% coverage" under common and normal printing conditions.

68.    Further, HP had a duty to disclose all of the above described material facts because HP programmed its printers to make graphic and verbal representations that toner cartridges are being gradually depleted, contrary to the reality that they are still substantially full under common and normal printing conditions and have not yet delivered their advertised yields.  Having programmed its printers to make any graphic or verbal communications to consumers about the remaining toner levels or the need to replace supplies, HP incurred a legal duty to make sure these disclosures are true and accurate in the context of both the actual supplies status and HP's advertised cartridge yield specifications.

69.    All of the above material facts were not known to Plaintiff and the Classes at the time they purchased HP printers, and at the time of their initial use of HP printers and toner cartridges, and at the time of purchasing multiple sets of HP new replacement cartridges.

70.    Plaintiff and the Classes relied on HP's advertisements that fraudulently concealed the whole truth about the design and operation of HP color laser printers, including the true expected page yields under common and normal printing conditions, leading the Plaintiff and the Classes to purchase said printers based on their trust that HP printers made efficient use of toner and would truly deliver advertised page yields based on actual average coverage, rather than deliberately fail to do so and cause consumers to waste efforts and money over the life of their printers on unnecessary and costly HP new replacement cartridges.

71.    Plaintiff and the Classes also relied on HP's misleading communications about the levels of remaining toner (showing that toner was being depleted when in fact it was not), which in

Law Offices of
TIMOTHY P. RUMBERGER
2161 Shattuck Ave., Suite 200
Berkeley, California 94704
(510) 841-5500

22

SECOND AMENDED CLASS ACTION COMPLAINT

turn led them to comply with HP's instructions that new HP cartridges had to be ordered and replaced at almost the price of a whole new printer with full cartridges included.

72.    Had the Plaintiff and the Classes been informed about the true level of color toner in their cartridges and the true amount of remaining advertised yields, and/or had they at least been offered an option to activate "override mode" by HP software without the threats of voided warranties when it instructed Plaintiff to "Replace supplies", they would have chosen to continue printing such as to obtain the full projected page yields as promised by HP and to receive the full use of all the "full-yield toner weight" they paid for, instead of wasting $300 or more on unnecessary replacement of each set of color toner cartridges.

73.    Had the Plaintiff and the Classes been informed about all of these facts (that taken together would tend to indicate that it is almost impossible to obtain the full measure of advertised page yields from HP products under common and normal printing conditions) they would not have purchased these HP printers or replacement cartridges.

74.    HP's fraudulent concealment of the true operating characteristics of its products prevented Plaintiff and the Classes from purchasing much more efficient and ultimately far less expensive printing solutions, including  (i) purchasing one of HP's own low-cost *monochrome laser printers or combination fax/printers* for thier day-to-day documents, such as letters, articles and invoices, while using HP *Color LaserJets* only for printing color documents or photographs, thus preventing the waste of expensive color cartridges; or  (ii) purchasing one of the alternate brands of color laser printers that do not "hard-stop" and do not needlessly waste the ample available color toner yield capacity when it is being utilized at a substantially slower rate than the black toner.

75.    HP's fraudulent concealment of the true operating characteristics and the true supplies status of its products also prevented Plaintiff and the Classes from planning and executing a much more efficient utilization schedule for their color cartridges, which could have enabled them to obtain a much greater portion of the advertised yields instead of needlessly wasting expensive color toner.  Had HP informed consumers fully and truthfully (prior to purchase and during the product use), consumers would have planned large color printing projects prior to reaching high

*Law Offices of*
TIMOTHY P. RUMBERGER
2161 Shattuck Ave., Suite 200
Berkeley, California 94704
(510) 841-5500

23

SECOND AMENDED CLASS ACTION COMPLAINT

page counts when these cartridges are likely to get "hard-stopped" by HP's technologies or start failing mechanically prior to delivering their full advertised yields.

76. HP's fraudulent concealment caused substantial damages to Plaintiff and the Classes in the amounts to be shown at trial, including, but not limited to, causing them to waste many hundreds of dollars on unnecessary HP new replacement color cartridges (the amount of suffered loss being proportional to the amount of deliberately blocked parts of the stated page yields), as well as causing Plaintiff and the Classes substantial loss of productivity and/or causing the Plaintiff and the Classes to incur technical consulting services expenses on addressing the stated defects and/or to unnecessarily shop for, install and recycle replacement toner cartridges.

## THIRD CAUSE OF ACTION
### Breach of the Covenant of Good Faith and Fair Dealing
### (On behalf of Class A and Class B)

77. Plaintiff repeats the allegations set forth above.

78. To prevail in a Breach of the Covenant of Good Faith and Fair Dealing claim, Plaintiffs in California courts must show that:

  a) *Plaintiff and Defendant entered into a contract;*

  b) *Plaintiff did substantially all of the significant things that the contract required Plaintiff to do;*

  c) *all conditions required for Defendant's performance had occurred;*

  d) *Defendant unfairly interfered with Plaintiff's right to receive the benefits of the contract; and*

  e) *Plaintiff was harmed by Defendant's conduct.*

79. HP's advertisements, web pages, point-of-sale brochures, as well as labels on the retail printer and cartridge packaging and live sales agents all consistently stated that the toner cartridges will deliver a certain page yield (2,500 pages for black and 2,000 pages for each of the color toner cartridges in the HP 2600n printer) based on the average 5% coverage per page, as described in great detail above. All of these communications to consumers constitute express

Law Offices of
TIMOTHY P. RUMBERGER
2161 Shattuck Ave., Suite 200
Berkeley, California 94704
(510) 841-5500

24

**SECOND AMENDED CLASS ACTION COMPLAINT**

warranties by HP as to the amount of printed pages Plaintiff and the Classes can count on obtaining based on the amount of color coverage they are actually printing on an average page. All of these communications are also contracts containing the implied covenant of good faith and fair dealing obligating HP to perform the terms and conditions, and see to the spirit of the contracts with good faith and to refrain from any conduct that precluded, prevented or impeded Plaintiff and the members of each Class from enjoying the benefits of the warranties, the contracts and the full promised benefits of the purchased HP printers and HP toner cartridges.

80.     While operating their HP printers and HP toner cartridges Plaintiff and the members of each Class performed all conditions, covenants and promises required of themselves in accordance with the warranties and purchase contracts.

81.     All the conditions required for HP's performance had been met by the Plaintiff.

82.     HP breached the implied covenant of good faith and fair dealing and unfairly interfered with Plaintiff's right to receive the benefits of the contract by (i) deliberately programming the HP toner tracking technologies such that they misled and continue to mislead consumers about the true level of remaining yield capacity under common and normal printing conditions, and by (ii) programming the HP supplies tracking technologies to "hard-stop" the full delivery of advertised page yields based on coverage and to prevent the full depletion of the "full-yield toner weight." In doing so, HP manipulated and is manipulating consumers to prematurely replace cartridges as described above in great detail.

83.     HP further breached the implied covenant of good faith and fair dealing and unfairly interfered with Plaintiff's right to receive the benefits of the contract (i.e. the full advertised page yield based on 5% coverage) by designing and continuing to manufacture and distribute new replacement cartridges that experience mechanical failures when operated in "override mode" after printing as few as 5,150 pages, at a time when these cartridges have not yet delivered a substantial part (observed to be as much as half by some consumers) of their advertised page yields based on 5% average coverage and have not yet consumed their "full-yield toner weight."

*Law Offices of*
TIMOTHY P. RUMBERGER
2161 Shattuck Ave., Suite 200
Berkeley, California 94704
(510) 841-5500

25

**SECOND AMENDED CLASS ACTION COMPLAINT**

3e6d

84.    As a direct, foreseeable and intended result of Defendant's breach of the implied
covenant of good faith and fair dealing, Defendant caused substantial damages to Plaintiff and the
Classes in the amounts to be shown at trial, including, but not limited to, causing them to waste
many hundreds of dollars on the unnecessary replacement color cartridges (amount of suffered loss
being proportional to the amount of deliberately blocked parts of the stated page yields), as well as
causing Plaintiff and the Classes substantial loss of productivity and/or causing the Plaintiff and the
Classes to incur technical consulting services expenses on addressing the stated defects and/or to
unnecessarily shop for, install and recycle replacement toner cartridges.

## FOURTH CAUSE OF ACTION
### Violation of Business & Professions Code § 17500, et seq.
### (On behalf of Class A and Class B)

85.    Plaintiff repeats the allegations set forth above as if fully contained herein.

86.    Business & Professions Code § 17500 states in part that:

"It is unlawful ... to make or disseminate ... in any publication, or any advertising
device, or in any other manner or means whatever, including ... over the Internet,
any statement, concerning ... personal property ... which is untrue or misleading, and
which is known, or which by the exercise of reasonable care should be known, to be
untrue or misleading, ... as part of a plan or scheme with the intent not to sell that
personal property ... so advertised ... as so advertised."

87.    During the four years preceding the original filing of this action through the present,
HP has engaged in advertising to the public and the Plaintiff in publications, retail displays, product
packaging, on TV and the Internet, including, but not limited to, printed and video advertising,
technical specifications, marketing brochures and other related published and verbal representations
related to the projected cartridge page yields based on 5% average coverage.  HP has also engaged
in promoting the overall supplies utilization efficiency of HP printers and cartridges, and touting
HP's high standards of integrity and dedication to serving its customers best interests and

*Law Offices of*
TIMOTHY P. RUMBERGER
2161 Shattuck Ave., Suite 200
Berkeley, California 94704
(510) 841-5500

26

**SECOND AMENDED CLASS ACTION COMPLAINT**

environmental conservation.  HP has engaged in the advertising alleged herein with the intent to directly or indirectly induce individual consumers and businesses to purchase HP products.

88.     HP's advertisements and marketing representations regarding color laser printers and toner cartridges are untrue, misleading, and are likely to deceive the public as described in great detail above.  HP knew, or by the exercise of reasonable care should have known, that its communications were untrue, misleading and likely to be deceptive.  HP publicly disseminated advertising and technical specifications for its products with the intent not to sell these products as advertised.  HP's advertisements, specifications and marketing representations constitute unfair competition, as well as unfair, deceptive and misleading advertising as prohibited under the Business and Professions Code § 17500, et seq.

89.     HP's business acts and practices have proximately caused substantial economic injury to the Plaintiff and the Classes, as well as to numerous competitors who manufacture and market comparable color laser printing products and replacement printing supplies.

90.     Unless restrained by this Court, Defendant will continue to engage in untrue, false and misleading advertising, as alleged above, thus tending to render judgment in the instant action ineffectual.  Plaintiff has no adequate remedy at law in that Defendant will continue to engage in untrue and misleading advertising, as alleged above, in violation of Business & Professions Code § 17500, thus engendering a multiplicity of proceedings.

## FIFTH CAUSE OF ACTION
### Violation of Consumers Legal Remedies Act ("CLRA")
### (On behalf of Class A)

91.     Plaintiff repeats the allegations set forth above as if fully contained herein.

92.     The Consumers Legal Remedies Act, Civil Code §1750, et seq., ("CLRA"), was designed and enacted to protect consumers from unfair and deceptive business practices.  To this end, the CLRA sets forth a list of unfair and deceptive acts and practices in Civil Code §1770.

Law Offices of
TIMOTHY P. RUMBERGER
2161 Shattuck Ave., Suite 200
Berkeley, California 94704
(510) 841-5500

27

SECOND AMENDED CLASS ACTION COMPLAINT

93.     The CLRA applies to HP's actions and conduct described herein because it extends to transactions that are intended to and have resulted in the sale or lease of goods or services for personal, family or household purposes within the meaning of Civil Code § 1761.

94.     At all relevant times, Plaintiff and members of Class A were "consumers" as that term is defined in Civil Code §1761(d).

95.     HP's business practices in connection with the marketing and sale of its printers and toner cartridges, as described in detail above, violate the CLRA in at least the following respects:

a)   In violation of § 1770(a)(5) (*"Representing that goods or services have … characteristics, ingredients, uses, benefits, or quantities which they do not have…"*) HP represented that **(i)** HP printers and toner cartridges have expected page yield characteristics and efficiency benefits which in fact they do not have under common and normal printing conditions;  and **(ii)** that the life of HP toner print cartridges depends on the amount of toner that print jobs require, when in fact it does not, instead substantially depending on the total number of pages run through the printer and passage of time, regardless of how little toner the printed pages actually require;

b)   In violation of § 1770(a)(9) (*"Advertising goods or services with intent not to sell them as advertised."*) HP advertised printers and toner cartridges with an intent not to sell them as devices that deliver advertised page yields based on coverage, or as efficient devices that only use toner that print jobs require, instead selling them as devices that are deliberately designed and programmed to block consumers from utilizing substantial amounts of their "full-yield toner weight" prior to delivering their advertised page yields based on 5% coverage, with the ultimate purpose of driving up the subsequent highly profitable sales of HP new replacement cartridges;

c)   In violation of § 1770(a)(15) (*"Representing that a part, replacement, or repair service is needed when it is not"*) HP advertised and sold printers and cartridges deliberately programmed to represent, under common and normal printing conditions, that costly replacements were required at a time when in fact these

Law Offices of
TIMOTHY P. RUMBERGER
2161 Shattuck Ave., Suite 200
Berkeley, California 94704
(510) 841-5500

28

**SECOND AMENDED CLASS ACTION COMPLAINT**

cartridges have not yet delivered their full advertised page yields based on 5% coverage, have not yet depleted most of their "full-yield toner weights" and in fact did not require replacement based on HP's own definitions of yield, depletion and projected mechanical life.  HP made these misrepresentations in order to multiply the highly profitable sales of HP new replacement cartridges.

96.    In addition, notwithstanding the above allegation of CLRA violation based on HP's failure to deliver full advertised yields while demanding through software/firmware messages that consumers unnecessarily replace toner cartridges, *this legal action makes a separate allegation that* *HP violated and continues to violate CLRA subsection 15 (Civil Code § 1770(a)(15)),  by* *representing to owners of its color laser printers that replacement of color toner cartridges are* *needed when in fact they are not* – *based on HP's own multiple verbal and published admissions* *that its color laser printers instruct owners to "prematurely" replace color toner cartridges:*

a)  Multiple statements made by HP tech support staff as well as the official published notices issued by HP (**Exhibits 7 and 9**) constitute explicit admissions that HP printers including the Color LaserJet 2600n, the CP-1518ni and numerous other models have  (i) deceived consumers with "*early toner low*" warnings, and/or (ii) "*prematurely provided an Order Supplies message or a Replace Supplies messages*," and/or  (iii) experienced a condition that HP support staff describes as a so-called "*11% bug*" whereupon "*the cartridge life percent remaining unexpectedly* *drops to 10% or less and then disables the cartridge shortly thereafter*";

b)  Furthermore, even though HP knew that consumers have experienced and will continue to experience substantial losses as a result of these known defects, HP failed to contact all the known owners who could have been easily reached through regular automated updates for Windows and Macintosh driver software;

c)  Furthermore, HP failed to establish any system of notification and/or claims to offer refunds and/or cartridge replacements to consumers who had already replaced and disposed of, or recycled, their still full HP cartridges prematurely and unnecessarily;

*Law Offices of*
TIMOTHY P. RUMBERGER
2161 Shattuck Ave., Suite 208
Berkeley, California 94704
(510) 841-5500

29

**SECOND AMENDED CLASS ACTION COMPLAINT**

d)   Furthermore, firmware updates issued by HP that promised to correct these defects in Color LaserJets were both unable to repair the prematurely "hard-stopped" cartridges and actually failed to correct these gross defects in HP printers.  **(Exhibits 1 & 7)** A scientific study of yield delivery by HP printers performed on behalf of consumers included testing HP 2600n and CP1518ni printers *after* installing all the HP recommended firmware upgrades and all the subsequent HP driver updates.  The study results demonstrated conclusively that, despite these supposed firmware fixes, HP printers continue to display "***early toner gauge readings***" and issue "***premature Replace Toner instructions***" in violation of CLRA § 1770(a)(15).

97.     HP's failure to disclose and knowing concealment of the true purpose, design and operating characteristics of its supplies tracking and display technology, as well as HP's failure to disclose and knowing concealment of the true remaining toner levels and remaining projected yield capacity inside cartridges "hard-stopped" from further printing prior to delivering their full advertised yields based on 5% coverage, are all omissions and concealments of material facts that constitute unfair and/or deceptive business practices in violation of Civil Code § 1770(a).

98.     HP further violated and continues to violate the CLRA at Civil Code §1770(a)(15) by representing to owners of its color laser printers that replacement of color toner cartridges are needed when they are not.  HP has admitted that its color laser printers instruct owners to "prematurely" replace color toner cartridges, by displaying a "replace supplies" message, when the cartridges in fact still contain substantial portions of their "full yield toner."

99.     HP's violations of Civil Code §1770 present a continuing threat to members of the public in that HP is continuing to engage in the practices alleged hereinabove, and will not cease until an injunction is issued by this Court.

100.    With the original filing of this action on August 1, 2008, Plaintiff provided Defendant with a legally sufficient and adequate notice and opportunity to cure its violations of CLRA.  The original complaint did not demand any CLRA-related damages, but only requested injunctive relief:  Paragraph 40 on page 12 of the complaint filed on August 1, 2008 described the

Law Offices of
TIMOTHY P. RUMBERGER
2161 Shattuck Ave., Suite 200
Berkeley, California 94704
(510) 841-5500

30

SECOND AMENDED CLASS ACTION COMPLAINT

1    alleged violations of § 1770(a)(5), (9) and (15), while its Paragraph 43 stated: *"With the filing of*

2    *this action, Plaintiff is providing Defendant with notice and opportunity to cure its violations. In*

3    *the event Defendant fails to do so, Plaintiff will amend this complaint to seek damages. Civil Code*

4    *1780(d)."*  In addition, HP received formal notice and had an opportunity to cure its violations of

5    § 1770(a)(15) from attorney *Kristen E. Law* on behalf of consumer *James Young* on 12-17-02008,

6    in a separate legal action which raised substantively similar issues without specifically accusing HP

7    of failure to deliver advertised yields.  Finally, on April 9, 2010 HP was served with a demand letter

8    written by attorney Dan Berko on behalf of this Plaintiff, Martha Sutherland, that described the

9    above-described violations of § 1770(a)(5), (9) and (15).  (**Exhibit 10**)

10        101.    HP failed to cure its violations of CLRA up through the present, and on 05-12-2010

11    it replied with a rebuttal and threats of retaliation against this Plaintiff who is seeking correction of

12    obvious and fully admitted defects, therefore, Plaintiff at this time seeks damages from Defendant.

13        102.    Plaintiff is entitled to an award of attorneys' fees and costs pursuant to Civil Code

14    §1780(d).

15

16                        **SIXTH CAUSE OF ACTION**
                **Violation of the Unfair Competition Law ("UCL"),**
17         **California Business & Professions Code § 17200, et seq.**
                        **(On behalf of Class A and Class B)**
18

19        103.    Plaintiff repeats the allegations set forth above as if fully contained herein.

20        104.    Starting approximately four years preceding the original filing of this action through

21    the present HP has committed acts of unfair competition proscribed by the UCL, which prohibits

22    unlawful, unfair or fraudulent business practices.

23        105.    The business acts and practices of HP herein alleged constitute unlawful business

24    practices because they violate the Covenant of Good Faith and Fair Dealing, California Business

25    and Professions Code § 17500 as described above and, with regard to Class A, the Consumers Legal

26    Remedies Act, California Civil Code § 1770, as alleged above.

27        106.    The business acts and practices of HP herein alleged constitute unfair business

28    practices in that said acts and practices offend public policy and are substantially injurious to

*Law Offices of*
TIMOTHY P. RUMBERGER
2161 Shattuck Ave., Suite 200
Berkeley, California 94704
(510) 841-5500

31

**SECOND AMENDED CLASS ACTION COMPLAINT**

1   consumers.  In addition, although it is not necessary to state a claim under § 17200, it is worth

2   noting that statutes to which that public policy is tethered include the provisions of the California

3   Business and Professions Code § 17500 and Civil Code § 1770, as alleged above.  Said acts and

4   practices continued by HP have no utility that outweighs their substantial harm to consumers.

5   107.    The business acts and practices of HP herein above alleged, constitute fraudulent

6   business practices in that said acts and practices are likely to deceive the public and affected

7   customers regarding the true operating characteristics and true operating costs of HP's printers,

8   HP's new replacement cartridges and HP's so-called "Sure Supply" technology.

9   108.    As a direct and proximate result of the acts and practices, HP has received (directly

10  and through its authorized distribution partners) and collected monies from customers, including

11  Plaintiff, to which HP is not entitled.  Such amounts properly belong to the customers who are

12  entitled to full restitution of amounts which HP wrongfully obtained from them through deceptive

13  business conduct alleged above.  In addition, any profits made by HP from the money paid by the

14  classes should be disgorged to the Plaintiff and the Classes.

15  109.    The unlawful, unfair and fraudulent business acts and practices of HP and the unfair,

16  deceptive, untrue and/or misleading advertising described herein present a continuing threat to the

17  Classes in that HP is currently engaging in such acts and practices and will persist and continue to

18  do so unless and until an injunction is issued by this Court.  Members of the Class therefore lack an

19  adequate remedy at law, and the Court's intervention is necessary to halt and remedy HP's

20  unlawful, unfair and fraudulent acts and practices.

21  110.    Pursuant to Business and Professions Code §17203, the Court should issue an order

22  enjoining HP from engaging in such acts and practices, ordering that HP use physical and/or

23  electronic means to recall and/or repair deceptive HP printing products presently in use by

24  consumers and ordering that HP provide appropriate restitution to all affected persons who suffered

25  losses as a result of HP's misconduct.

26  111.    Plaintiffs are entitled to an award of attorneys' fees and costs pursuant to Code of

27  Civil Procedure §1021.5.

28

*Law Offices of*
**TIMOTHY P. RUMBERGER**
2161 Shattuck Ave., Suite 200
Berkeley, California 94704
(510) 841-5500

32

**SECOND AMENDED CLASS ACTION COMPLAINT**

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays:

### ON ALL CAUSES OF ACTION

*#1: Breach of Express Warranty*

*#2: Fraudulent Concealment*

*#3: Breach of the Covenant of Good Faith and Fair Dealing*

*#4: Violation of Business & Professions Code § 17500*

*#5: Violation of Consumers Legal Remedies Act "CLRA" § 1770(a)(5), (9) and (15)*

*#6: Violation of Unfair Competition Law ("UCL"), Cal Business & Professions Code § 17200*

A. That this matter be certified as a class action, with Class A and Class B defined as set forth above, that Plaintiff be appointed Class representative, and her attorneys be appointed class counsel;

B. Costs of suit herein incurred;

C. Interest on all sums due as permitted by law;

D. Reasonable attorney's fees pursuant to CCP 1021;

E. For such other and/or further relief as is just and proper.

### ON THE FIRST, SECOND AND THIRD CAUSE OF ACTION

*#1: Breach of Express Warranty*

*#2: Fraudulent Concealment*

*#3: Breach of the Covenant of Good Faith and Fair Dealing*

F. General and special damages according to proof;

SECOND AMENDED CLASS ACTION COMPLAINT

**ON THE FOURTH AND SIXTH CAUSE OF ACTION**

*#4: Violation of Business & Professions Code § 17500*

*#6: Violation of Unfair Competition Law ("UCL"), Cal Business & Professions Code § 17200*

G.  Restitution of all money paid by the classes for unnecessary replacement toner cartridge purchases due to the remaining toner level readings which were inaccurate and misleading;

H.  Injunctive relief prohibiting HP from continuing to sell any current or future models of laser printers and replacement toner cartridges that contain deceptive technologies reporting false remaining toner levels and/or "hard-stopping" the use of cartridges which still contain usable toner prior to delivering their full advertised page yields based on 5% coverage;

I.  Orders requiring HP to issue and promote a software and/or firmware upgrade that effectively removes the above-described deceptive technologies from HP laser printers and toner cartridges already in use by consumers and/or prevents these printers from reporting false remaining toner readings and/or prevents these printers from "hard-stopping" the use of cartridges which still contain usable toner prior to delivering their full advertised page yields based on 5% coverage.

**ON THE FIFTH CAUSE OF ACTION**

*#5: Violation of Consumers Legal Remedies Act "CLRA"*

J.  General and special damages according to proof;

K.  Injunctive relief prohibiting HP from continuing to sell color laser printers and replacement toner cartridges until or unless HP effectively removes these deceptive

*Law Offices of*
TIMOTHY P. RUMBERGER
2161 Shattuck Ave., Suite 200
Berkeley, California 94704
(510) 841-5500

34

**SECOND AMENDED CLASS ACTION COMPLAINT**

technologies from the HP color laser printers and replacement toner cartridges already in use by consumers and/or prevents these printers from reporting false remaining toner readings and/or prevents these printers from "hard-stopping" the use of cartridges which still contain usable toner prior to delivering their full advertised page yields based on 5% coverage.

Respectfully submitted,

DATED:  August 30, 2010

BY: _____
TIMOTHY P. RUMBERGER, Esq.
Class Counsel for Representative Plaintiff
and the Plaintiff Classes

**SECOND AMENDED CLASS ACTION COMPLAINT**

**Exhibit E**

1  MORGAN, LEWIS & BOCKIUS LLP
   DANIEL JOHNSON, JR., State Bar No. 57409
2  AARON S. DUTRA, State Bar No. 216971
   One Market, Spear Street Tower
3  San Francisco, California 94105
   Telephone:    415.442.1000
4  Facsimile:    415.442.1001

5  MORGAN, LEWIS & BOCKIUS LLP
   KRISTOFOR T. HENNING (PAB 85047)
6  (*Pro Hac Vice application pending*)
   1701 Market Street
7  Philadelphia, PA 19103
   Telephone:    215.963.5000
8  Facsimile:    215.963.5001

9  Attorneys for Defendant
   HEWLETT-PACKARD COMPANY

10

11              SUPERIOR COURT OF THE STATE OF CALIFORNIA

12                      COUNTY OF SAN FRANCISCO

13

14  MARTHA SUTHERLAND,                  Case No. CGC 08-478150
    individually and on behalf of all
15  those similarly situated,           **NOTICE OF DEMURRER OF
                                         DEFENDANT HEWLETT-PACKARD
16                     Plaintiff,        COMPANY TO PLAINTIFF'S
                                         SECOND AMENDED COMPLAINT**
17       vs.

18  HEWLETT-PACKARD                      Hearing Date:    November 18, 2010
    COMPANY, A Delaware                  Time:            9:30 a.m.
19  corporation, Does 1 through 50,      Dept.:           302
                                         Judge:           Hon. Charlotte W. Woolard
20                     Defendant.

21

22  TO PLAINTIFF AND HER ATTORNEY OF RECORD:

23       PLEASE TAKE NOTICE on November 18, 2010 at Department 302 of the above-

24  captioned Court, located at 400 McAllister Street, San Francisco, CA 94102, at 9:30 a.m. or as

25  soon thereafter as the matter can be heard, defendant Hewlett-Packard Company ("HP") will and

26  hereby does demur to Plaintiff Martha Sutherland's ("Plaintiff's") Second Amended Complaint,

27  filed in Case No. CGC 08-478150, pursuant to California Code of Civil Procedure § 430.10

28  subdivisions (b), (e) and (f) and § 430.30.  HP's demurrer is made on the following grounds:

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

                                                     Case No. CGC 08-478150
                        DEMURRER OF DEFENDANT HEWLETT-PACKARD COMPANY

1.     All of Plaintiff's claims fail to state facts sufficient to constitute a cause of action because Plaintiff has not alleged that she received an actionable misrepresentation or omission from HP.

2.     Plaintiff has not alleged (and cannot allege) that her alleged injury was caused by HP's conduct.

3.     Plaintiff's warranty claim fails because HP has disclaimed any warranty that is the basis of Plaintiff's claims and further fails because Plaintiff did not receive less than she claims HP warranted.

4.     Plaintiff's claim under the "unfair" prong of the California Unfair Competition Law fails because she received the product HP described or under the "unlawful" prong because she has not alleged a violation of a predicate law.

HP's motion shall be based upon this notice, the attached demurrer, the memorandum of points and authorities filed concurrently herewith, the Request for Judicial Notice and Declaration of Aaron S. Dutra submitted in connection herewith, and upon such other matters as may be presented to the Court at the time of any hearing on this Motion.

Dated: October 21, 2010                    MORGAN, LEWIS & BOCKIUS LLP

                                           By: /s/ _____
                                                Aaron S. Dutra

                                           Attorneys for
                                           HEWLETT-PACKARD COMPANY

**DEMURRER**

Defendant Hewlett-Packard Company ("HP") hereby demurs to Plaintiff Martha Sutherland's ("Plaintiff's") Second Amended Complaint in Case No. CGC 08-478150 in its entirety and as to each cause of action asserted in Plaintiff's Second Amended Complaint pursuant to California Code of Civil Procedure § 430.10 subdivisions (b), (e) and (f) and § 430.30 as follows:

**Demurrer to First Cause of Action for "Breach of Express Warranty**

**(On behalf of Class A and Class B)"**

1.     The First Cause of Action for "Breach of Express Warranty (On behalf of Class A and Class B)" fails to state facts sufficient to constitute a cause of action because HP has disclaimed the warranties that form the basis of her claim.

2.     Plaintiff cannot maintain her First Cause of Action for "Breach of Express Warranty (On behalf of Class A and Class B)" because she has not alleged that she received less than she claims HP warranted.

3.     The First Cause of Action for "Breach of Express Warranty (On behalf of Class A and Class B)" fails to state facts sufficient to constitute a cause of action because Plaintiff has not alleged (and cannot allege) that her alleged injury was caused by HP's conduct.

**Demurrer to Second Cause of Action for "Fraudulent Concealment**

**(On behalf of Class A and Class B)"**

1.     The Second Cause of Action for "Fraudulent Concealment (On behalf of Class A and Class B)" fails to state facts sufficient to constitute a cause of action because Plaintiff has not alleged that she received an actionable misrepresentation or omission from HP.

2.     Plaintiff cannot maintain her Second Cause of Action for "Fraudulent Concealment (On behalf of Class A and Class B)" because Plaintiff has not alleged (and cannot allege) that her alleged injury was caused by HP's conduct.

**Demurrer to Third Cause of Action for "Breach of the Covenant of Good Faith and Fair**

**Dealing (On behalf of Class A and Class B)"**

1.     The Third Cause of Action for "Breach of Covenant of Good Faith and Fair

Morgan, Lewis &
Bockius LLP
Attorneys At Law
San Francisco

Case No. CGC 08-478150

DEMURRER OF DEFENDANT HEWLETT-PACKARD COMPANY

1    Dealing (On behalf of Class A and Class B)" fails to state facts sufficient to constitute a cause of

2    action because HP has disclaimed the warranties that form the basis of her claim.

3         2.    Plaintiff cannot maintain her Third Cause of Action for "Breach of Covenant of

4    Good Faith and Fair Dealing (On behalf of Class A and Class B)" because she has not alleged

5    that she received less than she claims HP warranted.

6         3.    The Third Cause of Action for "Breach of Covenant of Good Faith and Fair

7    Dealing (On behalf of Class A and Class B)" fails to state facts sufficient to constitute a cause of

8    action because Plaintiff has not alleged (and cannot allege) that her alleged injury was caused by

9    HP's conduct.

10   **Demurrer to Fourth Cause of Action for "Violation of Business & Professions Code §**

11   **17500, et seq. (On behalf of Class A and Class B)"**

12        1.    The Fourth Cause of Action for "Violation of Business & Professions Code §

13   17500, et seq. (On behalf of Class A and Class B)" fails to state facts sufficient to constitute a

14   cause of action because Plaintiff has not alleged that she received an actionable

15   misrepresentation or omission from HP.

16        2.    Plaintiff cannot maintain her Fourth Cause of Action for "Violation of Business &

17   Professions Code § 17500, et seq. (On behalf of Class A and Class B)" because Plaintiff has not

18   alleged (and cannot allege) that her alleged injury was caused by HP's conduct.

19   **Demurrer to Fifth Cause of Action for "Violation of Consumers Legal Remedies Act**

20   **("CLRA") (On behalf of Class A)"**

21        1.    The Fifth Cause of Action for "Violation of Consumers Legal Remedies Act

22   ("CLRA") (On behalf of Class A)" fails to state facts sufficient to constitute a cause of action

23   because Plaintiff has not alleged that she received an actionable misrepresentation or omission

24   from HP.

25        2.    Plaintiff cannot maintain her Fifth Cause of Action for "Violation of Consumers

26   Legal Remedies Act ("CLRA") (On behalf of Class A)" because Plaintiff has not alleged (and

27   cannot allege) that her alleged injury was caused by HP's conduct.

28

1   **Demurrer to Sixth Cause of Action for "Violation of the Unfair Competition Law ("UCL"),**

2   **California Business & Professions Code § 17200, et seq.**

3   **(On behalf of Class A and Class B)"**

4       1.      The Sixth Cause of Action for "Violation of the Unfair Competition Law

5   ("UCL"), California Business & Professions Code § 17200, et seq. (On behalf of Class A and

6   Class B)" fails to state facts sufficient to constitute a cause of action because Plaintiff has not

7   alleged that she received an actionable misrepresentation or omission from HP.

8       2.      Plaintiff cannot maintain her Sixth Cause of Action for "Violation of the Unfair

9   Competition Law ("UCL"), California Business & Professions Code § 17200, et seq. (On behalf

10  of Class A and Class B)" because Plaintiff has not alleged (and cannot allege) that her alleged

11  injury was caused by HP's conduct.

12      3.      The Sixth Cause of Action for "Violation of the Unfair Competition Law

13  ("UCL"), California Business & Professions Code § 17200, et seq. (On behalf of Class A and

14  Class B)" fails under the "unfair" prong of the California Unfair Competition Law because she

15  received the product HP described.

16      4.      Plaintiff cannot maintain her Sixth Cause of Action for "Violation of the Unfair

17  Competition Law ("UCL"), California Business & Professions Code § 17200, et seq. (On behalf

18  of Class A and Class B)" under the "unlawful" prong because she has not alleged a violation of a

19  predicate law.

20
    Dated: October 21, 2010                    MORGAN, LEWIS & BOCKIUS LLP
21

22
                                               By: /s/ _____
23                                                    Aaron S. Dutra

24                                             Attorneys for
                                               HEWLETT-PACKARD COMPANY
25

26

27

28

DEMURRER OF DEFENDANT HEWLETT-PACKARD COMPANY

1    MORGAN, LEWIS & BOCKIUS LLP
     DANIEL JOHNSON, JR., State Bar No. 57409
2    AARON S. DUTRA, State Bar No. 216971
     One Market, Spear Street Tower
3    San Francisco, California  94105
     Telephone:    415.442.1000
4    Facsimile:    415.442.1001

5    MORGAN, LEWIS & BOCKIUS LLP
     KRISTOFOR T. HENNING (PAB 85047)
6    *(Pro Hac Vice application pending)*
     1701 Market Street
7    Philadelphia, PA 19103
     Telephone:    215.963.5000
8    Facsimile:    215.963.5001

9    Attorneys for Defendant
     HEWLETT-PACKARD COMPANY

10

ENDORSED
F I L E D
Superior Court of California
County of San Francisco

OCT 2 1 2010

CLERK OF THE COURT
BY:    ROSSALY DELAVEGA
                Deputy Clerk

11              SUPERIOR COURT OF THE STATE OF CALIFORNIA

12                        COUNTY OF SAN FRANCISCO

13   MARTHA SUTHERLAND,                    Case No. CGC 08-478150
     individually and on behalf of all
14   those similarly situated,             **MEMORANDUM OF POINTS AND**
                                           **AUTHORITIES IN SUPPORT OF**
15                      Plaintiff,         **HEWLETT-PACKARD COMPANY'S**
                                           **DEMURRER TO PLAINTIFF'S**
16        vs.                              **SECOND AMENDED COMPLAINT**

17   HEWLETT-PACKARD
18   COMPANY, A Delaware                   Hearing Date:    November 18, 2010
     corporation, Does 1 through 50,       Time:            9:30 a.m.
19                                         Dept.:           302
                        Defendant.         Judge:           Hon. Charlotte W. Woolard
20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ............................................................................... 1

II.  SUMMARY OF COMPLAINT.............................................................. 3

III. LEGAL STANDARD ........................................................................ 6

IV.  ARGUMENT ................................................................................. 7

    A.   PLAINTIFF HAS NOT ALLEGED ANY INJURY CAUSED BY HP ............... 7

    B.   HP VALIDLY DISCLAIMED ANY WARRANTY THAT IS THE BASIS
        FOR PLAINTIFF'S EXPRESS WARRANTY CLAIM AND, IN ANY
        EVENT, PLAINTIFF HAS NOT ALLEGED THAT HP PROVIDED
        LESS THAN SHE CLAIMS IT WARRANTED. .................................... 8

    C.   THE PARTIES' AGREEMENT THAT HP DISCLOSED THE
        "OVERRIDE" FOR PLAINTIFF'S PRINTER IN HER USER GUIDE
        PRECLUDES ANY CLAIM FOR FRAUDULENT CONCEALMENT............. 10

    D.   PLAINTIFF HAS NOT STATED A CLAIM FOR VIOLATION OF THE
        FAL, CLRA OR UCL. ......................................................... 11

        1.   Plaintiff's FAL Claim Fails Because She Cannot Identify Any
                Allegedly False HP Advertisement, Let Alone One That She Saw
                And Relied Upon To Her Detriment.......................................... 11

        2.   Plaintiff Has Not Alleged Any Conduct That Violates The CLRA.......... 11

        3.   Plaintiff's UCL Claim Fails Under All Three Prongs Of The Statute ...... 12

V.   CONCLUSION ................................................................................ 13

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

i

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

*Long v. Hewlett-Packard Co.*, 2007 U.S. Dist. LEXIS 79262 (N.D. Cal. July 27, 2007),
*aff'd*, 316 Fed. Appx. 585 (9th Cir. Mar. 3, 2002) ........................................................ 9

*Salyards ex rel. Salyards v. Metso Minerals Tampere Oy*, 2005 U.S. Dist. LEXIS 29630
(E.D. Cal. 2005) ........................................................................................................... 9

*Schorsch v. Hewlett-Packard Co.*, 417 F.3d 748 (7th Cir. 2005) ........................................ 2

**STATE CASES**

*Californians for Disability Rights v. Mervyn's, LLC*, 138 P.3d 207 (Cal. 2006) ................... 11

*Camacho v. Auto Club of Southern Cal.*, 48 Cal. Rptr. 3d 770 ........................................... 12

*Collins v. Safeway Stores*, 187 Cal. App. 3d 62 (Cal. App. 1st Dist. 1986) ......................... 7

*Curcini v. County of Alameda*, 164 Cal. App. 4th 629 (1st Dist. 2008) ............................... 6

*Daugherty v. American Honda Motor Co., Inc.*, 144 Cal. App. 4th 824
(Cal. App. 2d Dist. 2006) ............................................................................................ 13

*Fisher v. San Pedro Peninsula Hospital*, 214 Cal. App. 3d 590 (Cal. App. 2d Dist. 1989) ........... 6

*Forsher v. Bugliosi*, 608 P.2d 716 (Cal. 1980) ................................................................ 4, 5

*Furia v. Helm*, 111 Cal. App. 4th 945 (1st Dist. 2003) ...................................................... 6

*Khoury v. Maly's of California, Inc.*, 14 Cal. App. 4th 612 (Cal. App. 2d Dist. 1993) ............... 11

*Koehrer v. Superior Court*, 181 Cal. App. 3d 1155 (Cal. App. 4th Dist. 1986) ..................... 7

*Krieger v. Nick Alexander Imports, Inc.*, 234 Cal. App. 3d 205 (1991) ............................... 9

*Lazar v. Hertz Corp.*, 69 Cal. App. 4th 1494 (Cal. App. 4th Dist. 1999) ............................ 12

*Marketing West, Inc. v. Sanyo Fisher (USA) Corp.*, 6 Cal. App. 4th 603
(Cal. App. 2d Dist. 1992) ............................................................................................ 10

*Mass. Mutual Life Insurance Co. v. Superior Court*, 97 Cal. App. 4th 1282
(Cal. App. 4th Dist. 2002) ........................................................................................... 11

*Racine & Laramie, Ltd., Inc. v. Department of Parks & Recreation*,
11 Cal. App. 4th 1026 (Cal. App. 4th Dist. 1992) ......................................................... 9

*Small v. Fritz Companies, Inc.*, 30 Cal. 4th 167 (Cal. 2003) ............................................. 7

*Stansfield v. Starkey*, 220 Cal. App. 3d 59 (2d Dist. 1990) ............................................... 6

*In re: Tobacco II Cases*, 46 Cal. 4th 298 (2009) ............................................................ 13

*Williams v. Beechnut Nutrition Corp.*, 185 Cal. App. 3d 135 (Cal. App. 2d Dist. 1986) ............ 7

1

## STATE STATUTES

2  Cal. Bus. & Prof. Code §§ 17204, 17203, 17535 ........................................ 7

3  Cal. Code Civ. Proc. § 430.10 .......................................................... 6

4  Cal. Civ. Code § 1780(a) .......................................................... 7, 12

5  Cal. Com. Code § 1201(10) ........................................................... 8

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEMURRER OF DEFENDANT HEWLETT-PACKARD COMPANY

**MEMORANDUM OF POINTS AND AUTHORITIES**

Defendant Hewlett-Packard Company ("HP") has demurred to Plaintiff Martha Sutherland's ("Plaintiff's) Second Amended Complaint.  For the reasons set forth below, Plaintiff's Second Amended Complaint fails to state any claim against HP for which relief can be granted and, therefore, HP's demurrer should be sustained and Plaintiff's Second Amended Complaint dismissed with prejudice.

**I.   INTRODUCTION**

Some of HP's color LaserJet printers include a so-called "hardstop" that prevents users from continuing to print once their print cartridges reach end-of-life.  Others include a mechanism that allows users to "override" the "hardstop" and to continue to print even after their print cartridges reach the point at which HP recommends replacement.  HP does not promise its customers access to every particle of toner in its print cartridges, but instead informs them of the average number of pages its print cartridges last (based on a particular level of coverage on the page) from their color print cartridges.  Plaintiff Martha Sutherland ("Plaintiff") filed this putative class action lawsuit challenging both kinds of printers, alleging that HP acted improperly both by stopping users from printing through the "hardstop" and by permitting users to continue printing past the "hardstop" as long as they desired.  Plaintiff has asserted claims for breach of express warranty, fraudulent concealment, breach of an implied covenant of good faith and fair dealing and for violations of California's False Advertising Law ("FAL"), Consumer Legal Remedies Act ("CLRA") and Unfair Competition Law ("UCL").

This is the fourth lawsuit to challenge HP's color LaserJet printers on the theory that they do not provide all of the output the law requires.  In all three prior lawsuits, the court dismissed the plaintiff's claims (whether through motion practice or voluntary dismissal) or entered summary judgment for HP.  There is no reason for a different result here.

*William Schorsch v. Hewlett-Packard Co.* was filed in Illinois state court in 2003 over HP's "non-override" printers.  The plaintiff in the *Schorsch* action voluntarily dismissed his case after, among other things, the United States Court of Appeals for the Seventh Circuit explained that consumers are "better off" with a print cartridge that precludes printing past the point at

1   which a user has likely received HP's stated average page yield but "before the streaking and

2   spotty output that marks the end of a cartridge's supply of toner"—*i.e.*, a printer/print cartridge

3   with a "hardstop." *See Schorsch v. Hewlett-Packard Co.*, 417 F.3d 748, 751 (7th Cir. 2005).

4   Logically, a user who can use the "override" mechanism described above can be no worse off.

5        *Kelsea Baggett v. Hewlett-Packard Co.* (Case No. SA CV 07-00667) was filed in the

6   United States District Court for the Central District of California in June 2007. The *Baggett*

7   action challenged HP's "non-override" printers and alleged, *inter alia*, that purchasers of those

8   printers were precluded from using all of the allegedly useable toner in their print cartridges and

9   from printing additional pages with any such toner. *See* Declaration of Aaron S. Dutra ("Dutra

10  Decl."), Ex. 2 (Complaint filed in *Baggett*). In September 2009, the Court in the *Baggett* action

11  granted summary judgment for HP.   The Court held that California's economic loss rule

12  precluded the *Baggett* plaintiff's claims for conversion and trespass to chattels because, *inter*

13  *alia*, his relationship with HP arose solely from their contractual relationship and that his

14  statutory and common law fraud claims failed for lack of injury or causation. *See* Dutra Decl.,

15  Ex. 3 (September 29, 2010 Order Granting HP's Motion for Summary Judgment in *Baggett*).

16       *James Young v. Hewlett-Packard Co.* (Case No. SA CV 09-00315) was filed in January

17  2009, also in the United States District Court for the Central District of California. The *Young*

18  action challenged HP's "override" printers and made claims similar to those asserted in the

19  *Baggett* action. *See generally* Dutra Decl., Ex. 4 (Complaint filed in *Young*). The *Young* action

20  also alleged that HP failed properly to disclose the existence and operation of the "override"

21  mechanism in its printers. *See* Dutra Decl., Ex. 4.  On March 16, 2010, the Court commented

22  that the *Young* action was "considerably weaker than" the *Baggett* action and dismissed the

23  *Young* action with prejudice. *See* Dutra Decl., Ex. 5 at 1 (March 16, 2010 Order Granting HP's

24  Motion to Dismiss *Young*).  Among other claims, the Court dismissed the *Young* plaintiff's

25  California unjust enrichment claim because the "override" mechanism in his HP color LaserJet

26  printer permitted him, even under his own allegations, to use the entire product he paid for and

27  dismissed his fraudulent concealment claim because HP's User Guide disclosed and explained

28  how to use the "override." *See* Dutra Decl., ex. 5 at 3.

1    Plaintiff has affirmatively alleged that her claims are like those asserted against HP in the

2    *Baggett* and/or *Young* actions.  In her First Amended Complaint filed on November 3, 2009, for

3    example, she referred to the "related 'Baggett'" litigation.  *See* Dutra Decl., Ex. 8 at ¶¶ 36, 47

4    (Plaintiff's First Amended Complaint).   Plaintiff also alleges that prior lawsuits against HP

5    (presumably the *Baggett* and *Young* actions) placed HP on notice of the nature of her complaints

6    about HP's color LaserJet printers.  *See* Plaintiff's Second Amended Complaint ("SAC") at ¶ 66.

7    Plaintiff also alleged specifically that the *Young* action placed HP on notice of her grievances

8    because it raised "substantively similar issues" as this case.  *See* SAC at ¶ 100.   It is not

9    surprising, therefore, that Plaintiff's claims fail for many of the same reasons as the claims in the

10   *Baggett* and *Young* actions failed.[1]

11   All of Plaintiff's claims fail because she has not alleged—and cannot allege— that she

12   suffered any injury as a result of HP's conduct.  There is no dispute that Plaintiff's printers are

13   "override" models that allow her to print as long as she desires.  Nor is there any dispute that HP

14   disclosed and explained the operation of the "override" in Plaintiff's User Guide.  Based on these

15   undisputed facts, therefore, Plaintiff had the ability to print as many pages as she desired and,

16   according to her allegations, receive the full yield of her cartridges.   Simply put, Plaintiff

17   received exactly what she paid for (if not more) and, therefore, none of her claims can survive.

18   **II.    SUMMARY OF COMPLAINT**

19   HP sells color LaserJet printers and printer supplies, including print cartridges.  *See* SAC

20   at ¶¶ 4, 19.  Plaintiff alleges that she bought two HP color LaserJet model 2600n printers

21   approximately four and five years ago respectively.  SAC at ¶ 13.  The 2600n is an "override"

22   printer.  SAC at ¶ 35.  Although Plaintiff alleges that her decision to purchase her HP printers

23   "was based on extensive research" and a "comprehensive review of HP product specifications,"

---

[1]    HP and the plaintiffs in the *Baggett* and *Young* actions entered into a class action settlement while the dismissals of those cases were on appeal that includes a release of the claims Plaintiff has asserted in this case.  The United States District Court for the Central District of California has granted preliminary approval to that settlement and ordered a stay of all claims released in the settlement.  Therefore, HP has filed separately a motion to stay this matter pending a determination of whether to grant final approval to that settlement.  HP has filed this demurrer in the alternative to that motion to stay and, therefore, respectfully requests that the Court consider HP's motion to stay first.

3          Case No. CGC 08-478150

1   she nevertheless claims in her SAC that she was unaware of the "override" at the time of her

2   purchase.  SAC at ¶¶ 31, 35.

3   　　　HP does not promise its customers that they will be able to access every particle of toner

4   in their print cartridges.  Instead, HP discloses the average number of pages a print cartridge will

5   last when printing at a certain coverage on the page.  As Plaintiff's User Guide explained:[2]

6   　　　**Supplies Life**

7   　　　The life of a print cartridge depends on the amount of toner that print jobs require.

8   　　　When printing text at approximately 5% coverage, a cyan, magenta, or yellow

9   　　　print cartridge for the HP Color LaserJet 2600n printer lasts an average of 2,000

10   　　　pages, and a black print cartridge lasts an average of 2,500 pages.   A typical

11   　　　business letter has 5% coverage.

12   *See* Dutra Decl., Ex. 7 at 92 (User Guide for HP LaserJet 2600n model printer).  HP's page yield

13   disclosures do not make any statements about the average number of pages a print cartridge

14   might last under any level of coverage other than 5%.[3]  Plaintiff alleges that HP's page yield

15   disclosures are consistent with the relevant International Standards Organization procedures.  *See*

16   SAC at ¶ 24.

17   　　　When a given print cartridge for Plaintiff's printer reached the point at which HP

18   recommends replacement, a "replace" message appears on the printer's control panel.  *See* Dutra

19   Decl., Ex. 7 at 94 ("**To ensure optimal print quality, HP recommends replacing a cartridge**

20   **when the Replace supplies message is displayed.**") (bold in original); *see also* SAC at ¶¶ 22,

21   32.  At that point, under its default setting, the printer will stop printing.  *See* Dutra Decl., Ex. 7

22   at 94.   Plaintiff was not prevented from continuing to print beyond any "replace" message,

23   however.  Rather, under the "Maintenance" section and a "Cartridge out override" sub-heading,

24

25   ────────────────

26   [2]　　　Plaintiff's User Guide is referenced and incorporated into Plaintiff's Second Amended
Complaint and, therefore, is appropriately considered on HP's demurrer.  SAC at ¶ 25; *see*

27   *Forsher v. Bugliosi*, 608 P.2d 716, 717 n.1 (Cal. 1980) (affirming a demurrer based in part upon
a document "incorporated by reference into the complaint").

28   [3]　　　HP's 5% coverage reference means that each color covers 5% of the page.

1   Plaintiff's User Guide plainly explains the "override" mechanism and its relationship to the

2   "replace" supplies message on his printer control panel:

3       Cartridge Out Override

4       What is it?

5       The HP Color LaserJet 2600n printer displays an **Order supplies** message
    when a cartridge is running low and a **Replace supplies** message when a

6       cartridge has been depleted.  **To ensure optimal print quality, HP
    recommends replacing a cartridge when the Replace supplies message**

7       **is displayed**.  Replacing the cartridge at this point can help prevent waste
    of media or other cartridges when one cartridge produces poor print

8       quality.

9       The Cartridge Out Override feature allows the printer to continue using a

10      cartridge that has reached the recommended replacement point.

11      Using Override may result in unsatisfactory print quality and unavailability
    of certain features (such as toner remaining information).

12

13      All print defects or supply features incurred when an HP supply is used in
    Override will not be considered defects in materials or workmanship in the

14      supply under HP's Print Cartridge Limited Warranty Statement.

15  *See* Dutra Decl., Ex. 7 at 94 (and included in Exhibit 6 to the SAC) (bold in original).  According

16  to Plaintiff, use of the "override" allows a user to receive HP's full stated page yield.  *See* SAC at

17  ¶¶ 37, 58; *see also id.* at ¶ 39; ¶ 64 (alleging that "override" "enables continued printing (using

18  the substantial remaining actual yield capacity and the 'full-yield toner weight'")).

19

20      According to Plaintiff, her printers stopped printing and she received the "Replace"

21  supplies message described above.  SAC at ¶ 32.  She then bought replacement print cartridges

22  without taking advantage of the "override" for her printer.  SAC at ¶ 32.  Plaintiff has alleged

23  previously that she received at least one free set of print cartridges from HP.  *See* Dutra Decl.,

24  Ex. 8 at ¶ 18; SAC at ¶ 37.  Plaintiff alleges that she did not know about the "override" when she

25  received a "Replace" supplies message.  She claims not to have discovered that fact until January

26  2008.  SAC at ¶ 35.  According to Plaintiff, even if she had known about the "override," she

27  would not have used it because her User Guide cautioned that printing in "override" mode "may

28  result in unsatisfactory print quality and unavailability of certain features (such as toner

remaining information)" and that any defects that occurred in "override" mode would not be covered under "HP's Print Cartridge Limited Warranty Statement."  SAC at ¶ 34; Dutra Decl., Ex. 7 at 94.  Plaintiff does not allege that any of those cautionary statements from HP are false or incorrect, however.

According to Plaintiff, she retained an unnamed "technology consultant" in January 2008 because her printer stopped at a point where "she was quite certain [it] had not yet delivered" HP's "advertised page yields based on 5% average coverage."  SAC at ¶ 35.  Plaintiff does not allege, however, how many pages she printed or at what page coverage she printed for either of her HP printers.  That is true even though Plaintiff's print cartridges are presumably within her possession, she apparently has access to a "technology consultant" and she or a third-party has performed what Plaintiff characterizes as a *scientific study of yield delivery by HP Color LaserJet printers*."  SAC at ¶ 8(e) (bold and italics in original).

## III.   LEGAL STANDARD

A demurrer is proper where "[t]he person who filed the pleading does not have the legal capacity to sue," "[t]he pleading does not state facts sufficient to constitute a cause of action," or "[t]he pleading is uncertain . . . . ambiguous [or] unintelligible."  Cal. Code Civ. Proc. § 430.10(b), (e) and (f).  Although the Court generally accepts as true the complaint's well-pleaded factual allegations, it should not assume the truth of a plaintiff's contentions, deductions or conclusions of fact or law.  *See Fisher v. San Pedro Peninsula Hosp.*, 214 Cal. App. 3d 590, 604 (Cal. App. 2d Dist. 1989).  Moreover, in California, claims grounded in fraud "are subject to strict requirements of particularity in pleading."  *Furia v. Helm*, 111 Cal. App. 4th 945, 956 (1st Dist. 2003) (citation and internal quotations omitted); *see also Curcini v. County of Alameda*, 164 Cal. App. 4th 629, 649 (1st Dist. 2008).  To assert a claim for fraud, a plaintiff must state the "who, what, when, where, and how" of the alleged misconduct.  *Stansfield v. Starkey*, 220 Cal. App. 3d 59, 72-73 (2d Dist. 1990).  Importantly, "[e]very fact constituting the fraud must be alleged . . . the policy of liberal construction will not ordinarily be invoked to sustain a defective pleading."  *Furia*, 111 Cal. App. 4th at 956; *see also Stansfield*, 220 Cal. App. 3d at 72-73.

IV.    **ARGUMENT**

  A. **PLAINTIFF HAS NOT ALLEGED ANY INJURY CAUSED BY HP.**

  All of Plaintiff's claims require that she suffer an injury caused by HP's conduct.[4]  *See* SAC at ¶¶ 53, 61, 78.  The gravamen of Plaintiff's Second Amended Complaint is that HP prevented her from printing all the pages she could have printed and that she contends HP indicated she would receive.  *See, e.g.,* SAC at ¶¶ 6, 7, 26.  According to Plaintiff's own allegations, however; (1) her HP printer had an "override" that allowed her to print as long as she desired (SAC at ¶ 35); (2) HP disclosed the "override" mechanism in her printer's User Guide (SAC at ¶ 36); and (3) at least through use of the "override" (if not otherwise) Plaintiff could receive the full yield to which she claims she was entitled (SAC at ¶ 58).  As a result, by Plaintiff's own admission, she had the ability to obtain all the pages she claims she was entitled to from her printer.  Therefore, she cannot show any injury as a result of HP's conduct.

  Plaintiff's apparent attempt to avoid this simple fact only reveals the further flaws in her claims.  As HP explained above, its average page yield disclosure is based on printing at 5% coverage for a particular page.  Plaintiff does not allege that she received fewer than the average pages HP discloses (2,000) at that level of printing.[5]  Instead, Plaintiff claims that HP's average page yield disclosure (2,000) at 5% coverage must mean that users should receive 5 times that number of pages at 1/5 of that coverage or 1/5 the pages at 5 times the page coverage.  *See* SAC at p. 9 n. 1.  But HP made no such promise—and Plaintiff does not allege otherwise.  HP's only

---

[4] *See Small v. Fritz Companies, Inc.,* 30 Cal. 4th 167, 204 (Cal. 2003) (denying plaintiff's fraud claim where "plaintiff suffered no injury due to the content of the alleged misrepresentations"); *Williams v. Beechnut Nutrition Corp.,* 185 Cal. App. 3d 135, 142 (Cal. App. 2d Dist. 1986) (finding that a breach of express warranty claim requires a showing that the breach "proximately causes [the] plaintiff injury"); *Koehrer v. Superior Court,* 181 Cal. App. 3d 1155, 1167 (Cal. App. 4th Dist. 1986) (describing "resultant damages" element of good faith and fair dealing claim); Cal. Bus. & Prof. Code §§ 17204, 17203, 17535 (requiring UCL and FAL plaintiff to show that he/she "suffered an injury in fact and . . . lost money or property as a result of" defendant's conduct); Cal. Civ. Code § 1780(a) (requiring CLRA plaintiff to show "damage as a result of" defendant's conduct); *see also Collins v. Safeway Stores,* 187 Cal. App. 3d 62, 72 (Cal. App. 1st Dist. 1986) ("California law has long required that a person suffer detriment in order to have a claim for recovery of damages").

[5] Importantly, HP indicated only that when printing at 5% coverage, Plaintiff's color print cartridges last "an *average* of 2,000 pages." *See* Dutra Decl., Ex. 7 at 92 (emphasis added).  It did not promise that Plaintiff would receive 2,000 pages from her color print cartridges— although she alleges that she could have through use of the "override" in her printer.

page yield disclosure alleged in Plaintiff's Second Amended Complaint provides only an average page yield based on 5% page coverage.  HP made no average page projections based on any other level of printing and, therefore, Plaintiff cannot show any failure to comply with any such non-existent promise.

Plaintiff's failure to allege any injury caused by HP's conduct requires her entire Second Amended Complaint to be dismissed with prejudice without consideration of the additional flaws in Plaintiff's claims.  Nevertheless, HP has identified below additional defects that require dismissal of Plaintiff's Second Amended Complaint.

**B.     HP VALIDLY DISCLAIMED ANY WARRANTY THAT IS THE BASIS FOR PLAINTIFF'S EXPRESS WARRANTY CLAIM AND, IN ANY EVENT, PLAINTIFF HAS NOT ALLEGED THAT HP PROVIDED LESS THAN SHE CLAIMS IT WARRANTED.**

HP does not warrant that "the operation of [Plaintiff's printer] will be uninterrupted or error free." *See* Dutra Decl., Ex. 7 at 131.  HP warrants only that its hardware, accessories and software will be free from defects in materials or workmanship for one year and that, if not, HP will make any necessary repairs if it receives notice within the warranty period. *See* Dutra Decl., Ex. 7 at 131.  HP conspicuously and expressly disclaimed any other warranty—as California law permits it to do. *See id.* at 131 ("TO THE EXTENT ALLOWED BY LOCAL LAW, THE ABOVE WARRANTIES ARE EXCLUSIVE AND NO OTHER WARRANTY OR CONDITION, WHETHER WRITTEN OR ORAL, IS EXPRESS OR IMPLIED. . . ."); Cal. Com. Code § 1201(10).

HP's disclaimer precludes Plaintiff's express warranty claim.  Plaintiff alleges that HP failed to live up to extra-contractual statements she claims HP made about her printer in "advertisements, written representations, web pages, as well as labels on the retail printer and cartridge packaging." *See* SAC at ¶ 54.  HP disclaimed any warranties beyond those found in its Limited Warranty, however—including the alleged warranties that are the basis of Plaintiff's claim.  Other courts in California faced with warranty claims against HP based on alleged extra-

DEMURRER OF DEFENDANT HEWLETT-PACKARD COMPANY

1    contractual statements have already decided that HP's disclaimer is valid and precludes the types

2    of warranty claims Plaintiff has asserted here. *See Long v. Hewlett-Packard Co.*, 2007 U.S. Dist.

3    LEXIS 79262, at \*18-19 (N.D. Cal. July 27, 2007) (addressing nearly identical warranty

4    disclaimer language and holding that "HP validly disclaimed any express warranty created by

5    virtue of its extracontractual statements"), *aff'd*, 316 Fed. Appx. 585 (9th Cir. Mar. 3, 2002); *see*

6    *also* Dutra Decl., Ex. 9 (May 28, 2009 Order Granting in Part and Denying in Part Defendant's

7    Motion to Dismiss in *Nygren v. Hewlett-Packard Co.*, Case No. C 07-05793 JW (N.D. Cal.)) at

8    10-11 (dismissing extracontractual warranty claim against HP based on nearly identical warranty

9    disclaimer language).[6]  There is no reason for a different result here.

10          Even if HP had not validly disclaimed the alleged warranties that are the basis for

11   Plaintiff's claim, she has not alleged that she received less than she claims HP warranted.  As

12   explained above, HP made no average page yield disclosure based on any page coverage other

13   than 5% and Plaintiff does not allege that she received less than HP's projected average page

14   yield at that page coverage.   In addition, HP disclosed only an average page yield at 5%

15   coverage—not that Plaintiff would be guaranteed a particular number of pages.  Plaintiff does

16   not allege that HP's average page yield disclosure based on 5% coverage is incorrect.[7]

17   \\

18   \\

19   \\

20   \\

21

22   [6]       *See also Salyards ex rel. Salyards v. Metso Minerals Tampere Oy*, 2005 U.S. Dist.
     LEXIS 29630, at \*27 (E.D. Cal. 2005) ("A defendant can exclude express and implied
23   warranties if the disclaimer is conspicuous."); *Krieger v. Nick Alexander Imports, Inc.*, 234 Cal.
     App. 3d 205, 212-13 (1991) ("A seller is permitted to limit its liability for defective goods by
24   disclaiming or modifying a warranty.").

25   [7]       Plaintiff's claim for breach of an implied covenant of good faith and fair dealing rests on
     the assumption that the alleged extra-contractual warranties that are the basis for her express
26   warranty claim created a contract with HP.  They did not and, therefore, Plaintiff's implied
     covenant of good faith and fair dealing claim fails for the same reason as her express warranty
27   claim. *See Racine & Laramie, Ltd., Inc. v. Dept. of Parks & Recreation*, 11 Cal. App. 4th 1026,
     1032 (Cal. App. 4th Dist. 1992) ("If there exists a contractual relationship between the parties, as
28   was the case here, the implied covenant is limited to assuring compliance with the express terms
     of the contract, and cannot be extended to create obligations not contemplated in the contract.").

                                                9                    Case No. CGC 08-478150

**C.   THE PARTIES' AGREEMENT THAT HP DISCLOSED THE "OVERRIDE" FOR PLAINTIFF'S PRINTER IN HER USER GUIDE PRECLUDES ANY CLAIM FOR FRAUDULENT CONCEALMENT.**

Plaintiff alleges that HP concealed from her that her printer could print more pages after the "hardstop" that accompanied the "Replace" supplies message she claims she received.  To sustain a claim for fraudulent concealment, Plaintiff must plead and prove that HP "intentionally concealed or suppressed the fact with the intent to defraud the plaintiff." *Marketing West, Inc. v. Sanyo Fisher (USA) Corp.*, 6 Cal. App. 4th 603, 613 (Cal. App. 2d Dist. 1992).  As explained above, however, there is no dispute that HP's User Guide disclosed and explained how to use the "override" for Plaintiff's printer to continue printing past the "Replace" supplies message as long as she desired and, according to Plaintiff, receive all the pages she claims she was entitled to from her print cartridge.  The Court's decision dismissing the fraudulent concealment claims in the *Young* action is again equally on point here:   "Plaintiff cannot plausibly allege a 'concealment' while also acknowledging that the User Guide gave instructions on how to override the shutdown mechanism." *See* Dutra Decl., Ex. 5 at 3.

Neither has Plaintiff alleged the causation element of her claim.  According to Plaintiff, she would not have used the "override" mechanism in her printer even if she had seen it in her User Guide by the time she received a "Replace" supplies message. *See* SAC at ¶ 34.  Thus, according to Plaintiff, she would have behaved in exactly the same way whether or not HP disclosed her ability to continue printing past the "Replace" supplies message.  In that case, she cannot logically claim that HP's conduct caused her any harm.

\\

\\

\\

\\

DEMURRER OF DEFENDANT HEWLETT-PACKARD COMPANY

**D.    PLAINTIFF HAS NOT STATED A CLAIM FOR VIOLATION OF THE FAL, CLRA OR UCL.**

**1.    Plaintiff's FAL Claim Fails Because She Cannot Identify Any Allegedly False HP Advertisement, Let Alone One That She Saw And Relied Upon To Her Detriment.**

Plaintiff has not identified with any particularity the content of any alleged HP advertisement, if any, she claims she saw and relied upon prior to her printer purchases and her FAL claim must fail for this reason alone. *See Californians for Disability Rights v. Mervyn's, LLC*, 138 P.3d 207, 209 (Cal. 2006) (explaining that Proposition 64 was intended to prevent private lawsuits by plaintiffs who had not "viewed the defendant's advertising"); *Khoury v. Maly's of California, Inc.*, 14 Cal. App. 4th 612, 618 (Cal. App. 2d Dist. 1993) (requiring plaintiff to state "with reasonable particularity the facts supporting" claim). Moreover, to the extent Plaintiff claims to have seen HP's average page yield disclosure outlined above prior to her purchase, HP explained above why those disclosures are accurate. Therefore, the Court should dismiss Plaintiff's FAL claim with prejudice.

**2.    Plaintiff Has Not Alleged Any Conduct That Violates The CLRA.**

Plaintiff's CLRA claim fails for the simple reason that it ignores the "override" mechanism in her printer and HP's undisputed disclosure of that "override" in Plaintiff's User Guide. Plaintiff claims that HP: (1) represented that her printer could print more pages than she claims she received prior to receiving the "Replace" supplies message described above and (2) represented through the "Replace" supplies message that a replacement print cartridge was necessary when, in fact, it was not. *See* SAC at ¶ 95. HP already explained above why its actual average page yield disclosures (rather than those Plaintiff has attempted to create) are accurate and Plaintiff's claim fails for that reason alone. In addition, Plaintiff has not identified any representation from HP she claims she saw before her printer purchase. *See Mass. Mut. Life Ins. Co. v. Superior Court*, 97 Cal. App. 4th 1282, 1292 (Cal. App. 4th Dist. 2002) (stating that "plaintiffs in a CLRA action [must] show not only that a defendant's conduct was deceptive but

that the deception caused them harm"). More than that, however, Plaintiff agrees that the "override" permits users to receive the full page yield from their print cartridges and that her User Guide disclosed that she could continue to print beyond the "Replace" supplies message by using the "override" mechanism. Therefore, her CLRA claim fails because she has not alleged either conduct prohibited by the CLRA or injury as a result. *See* Cal. Civ. Code § 1780(a) (requiring "damage as a result of" defendant's' conduct).

### 3.   Plaintiff's UCL Claim Fails Under All Three Prongs Of The Statute.

The failure of Plaintiff's other claims precludes her claim under the "unlawful" prong of the UCL. Because the UCL borrows violations from other laws and treats them as independently actionable, an "unlawful" UCL claim fails as a matter of law where there is no violation of a predicate law. *See Lazar v. Hertz Corp.*, 69 Cal. App. 4th 1494, 1505 (Cal. App. 4th Dist. 1999). Accordingly, because all of Plaintiff's other claims fail, so does her "unlawful" UCL claim.

Plaintiff's claim under the "unfair" prong of the UCL fares no better. A plaintiff asserting a UCL "unfair" claim must show that: (1) her alleged injury was substantial; (2) but was not outweighed by any benefits to consumers; and (3) she could not have avoided her alleged injury. *See, e.g., Camacho v. Auto Club of Southern Cal.*, 48 Cal. Rptr. 3d 770, 777 (Cal. App. 2d Dist. 2006). It can hardly be described as "unfair" for HP to permit Plaintiff to print as long as she desired through use of the "override" mechanism in her printer and to disclose her ability to do so in her User Guide. Indeed, Plaintiff's Second Amended Complaint complains that she was not able to print as long as she desired—but the "override" undisputedly permitted her to do so. In that case, Plaintiff cannot show any injury, let alone a substantial one, that she could not avoid.

Plaintiff's claim under the "fraudulent" prong of the UCL fails for many of the reasons her other claims fail. There is no dispute that HP disclosed the "override" in Plaintiff's printer in her User Guide and that, according to Plaintiff, the "override" permits a user to obtain the full yield of his/her print cartridge. Plaintiff cannot, therefore, allege that HP defrauded her. Not only that, but since Plaintiff alleges that she would have behaved in exactly the same manner

1   whether or not she knew of the "override" in her printer, she cannot satisfy the detrimental

2   reliance element of her claim. *See In re: Tobacco II Cases*, 46 Cal. 4th 298, 320 (2009).[8]

3         To the extent Plaintiff seeks to assert a failure to disclose claim, her claim fails.  First, by

4   disclosing the "override" for Plaintiff's printer, HP disclosed Plaintiff's ability to print beyond

5   the "Replace" supplies message as long as she desired and, according to Plaintiff, receive the full

6   page yield from her print cartridges.  SAC at ¶¶ 36, 58.  Second, and putting aside Plaintiff's

7   ability to print as long as she desired, to the extent Plaintiff alleges that HP failed to disclose that

8   she might not receive a certain number of pages at a page coverage other than 5%, HP never

9   made any page yield representation based on any coverage other than 5% and, therefore, any

10  such omission is not contrary to any statement HP actually made.  Accordingly, Plaintiff's failure

11  to disclose theory fails for this reason as well.  *See Daugherty v. American Honda Motor Co.,*

12  *Inc.*, 144 Cal. App. 4th 824, 835 (Cal. App. 2d Dist. 2006) (finding that "to be actionable the

13  omission must be contrary to a representation actually made by the defendant").

14  **V.     CONCLUSION**

15

16        The Court should dismiss Plaintiff's Second Amended Complaint with prejudice.

17

18  Dated: October 21, 2010                      MORGAN, LEWIS & BOCKIUS LLP

19

20  By: /s/ _____
                   Aaron S. Dutra

21

22                                              Attorneys for
                                                HEWLETT-PACKARD COMPANY

23

24

25

26

27  _____

28  [8]     Plaintiff does not allege that she saw any allegedly fraudulent statement or omission
    before her printer purchase.

                                    13              Case No. CGC 08-478150

1   MORGAN, LEWIS & BOCKIUS LLP
     DANIEL JOHNSON, JR., State Bar No. 57409
2   AARON S. DUTRA, State Bar No. 216971
     One Market, Spear Street Tower
3   San Francisco, California 94105
     Telephone:   415.442.1000
4   Facsimile:   415.442.1001

5   MORGAN, LEWIS & BOCKIUS LLP
     KRISTOFOR T. HENNING (PAB 85047)
6   (*Pro Hac Vice application pending*)
     1701 Market Street
7   Philadelphia, PA 19103
     Telephone:   215.963.5000
8   Facsimile:   215.963.5001

9   Attorneys for Defendant
     HEWLETT-PACKARD COMPANY

10

11             SUPERIOR COURT OF THE STATE OF CALIFORNIA

12                 COUNTY OF SAN FRANCISCO

13

14   MARTHA SUTHERLAND, individually   |   Case No. CGC 08-478150
     and on behalf of all those similarly
15   situated,   |   **[PROPOSED] ORDER GRANTING DEMURRER OF HEWLETT-PACKARD COMPANY TO PLAINTIFF'S SECOND AMENDED COMPLAINT**
16               Plaintiff,

17        vs.   |   Hearing Date:   November 18, 2010
                          Time:   9:30 a.m.
18   HEWLETT-PACKARD COMPANY, A   |   Dept.:   302
     Delaware corporation, Does 1 through 50,   Judge:   Hon. Charlotte W. Woolard
19               Defendant.

20

21   **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD**

22         The Demurrer of Defendant Hewlett-Packard Company ("HP") to Plaintiff Martha

23   Sutherland's ("Plaintiff's) Second Amended Complaint came on for hearing by this Court on

24   November 18, 2010, at 9:30 a.m.   All parties were represented by counsel.   After full

25   consideration of the pleadings and of all moving, opposition, and reply papers, and after due

26   attention to the oral argument presented by counsel, and with good cause appearing,

27         **IT IS ORDERED** that the Demurrer of Defendant HP to Plaintiff's First Cause of Action

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB1/65882989.1                                   Case No. CGC 08-478150
   [PROPOSED] ORDER GRANTING DEFENDANT HEWLETT-PACKARD COMPANY'S DEMURRER TO
PLAINTIFF'S SECOND AMENDED COMPLAINT

RECEIVED OCT 21 2010 By

for Breach of Express Warranty; Second Cause of Action for Fraudulent Concealment; Third Cause of Action for Breach of Covenant of Good Faith and Fair Dealing; Fourth Cause of Action for Violation of Business & Professions Code § 17500, *et seq.*; Fifth Cause of Action for Violation of Consumers Legal Remedies Act and Sixth Cause of Action for Violation of the Unfair Competition Law ("UCL"), California Business & Professions Code § 17200, *et seq.* are all **SUSTAINED, WITHOUT LEAVE TO AMEND** on the ground that Plaintiff has not alleged, and cannot allege, that her alleged injury was caused by any conduct attributable to HP.

**IT IS FURTHER ORDERED** that the Demurrer of Defendant HP to Plaintiff's Second Cause of Action for Fraudulent Concealment; Fourth Cause of Action for Violation of Business & Professions Code § 17500, *et seq.*; Fifth Cause of Action for Violation of Consumers Legal Remedies Act and Sixth Cause of Action for Violation of the UCL, California Business & Professions Code § 17200, *et seq.* are all **SUSTAINED, WITHOUT LEAVE TO AMEND** on the ground that Plaintiff has not alleged that she received an actionable misrepresentation or omission from HP.

**IT IS FURTHER ORDERED** that the Demurrer of Defendant HP to Plaintiff's First Cause of Action for Breach of Express Warranty and Third Cause of Action for Breach of Covenant of Good Faith and Fair Dealing are **SUSTAINED, WITHOUT LEAVE TO AMEND** on the grounds that HP has disclaimed any warranty that is the basis of Plaintiff's claims and further because Plaintiff did not receive less than she claims HP warranted.

**IT IS FURTHER ORDERED** that the Demurrer of Defendant HP to Plaintiff's Sixth Cause of Action for Violation of the "unlawful" and "unfair" prongs of the UCL, California Business & Professions Code § 17200, *et seq.*, is **SUSTAINED, WITHOUT LEAVE TO AMEND** on the grounds that Plaintiff has not alleged a violation of a predicate law and further because Plaintiff received the product HP described.

\\

\\

\\

\\

[PROPOSED] ORDER GRANTING DEFENDANT HEWLETT-PACKARD COMPANY'S DEMURRER TO
PLAINTIFF'S SECOND AMENDED COMPLAINT

1    **IT IS FURTHER ORDERED** the Defendant Hewlett-Packard Company is

2    **DISMISSED** from this action.

3

4    Dated: _____

                                          _____

5                                             HON. CHARLOTTE W. WOOLARD
                                         Judge of the Superior Court – San Francisco County

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[PROPOSED] ORDER GRANTING DEFENDANT HEWLETT-PACKARD COMPANY'S DEMURRER TO
PLAINTIFF'S SECOND AMENDED COMPLAINT

**Exhibit F**

ESCAPING THE TRAP OF A WORTHLESS HP LASERJET SETTLEMENT

1)   YIELD-FRAUD BASED STRATEGIES COMPARED TO "BLOCKED AVAILABLE TONER" LITIGATION

Richard described our yield-based strategy in Sutherland as "myopic" (which just added a new word to my vocabulary)...

Unfortunately, it was the KBK strategy that proved shortsighted, while the predictions I made in September 2008 proved to be insightful, far reaching and correct. You might not recall these details, but the thoughts I left your team with at the end of that meeting were:

a)   While blocking leftover toner might be wasteful, not focusing on yield fraud, your cases will likely run into trouble, because full delivery of advertised yields is the only legally binding promise made by HP;

b)   Lacking a professional technology consultant who has substantial experience with actual consumers of HP products, a comprehensive understanding of a broad range of underlying technologies and skills to communicate complex technical issues in a language that judges and news reporters can understand will substantially weaken your cases;

c)   When Darren boasted of also going after Brother laser printers, I warned that my experiences with numerous clients indicated that Brother monochrome printers are completely honest, while Brother color laser printers are either substantially honest, or are far less aggregious than HP printers when it comes to delivering full advertised yields.

While outcomes speak for themselves, it is also important to consider the causes, which leads to this question:

2)   HAVE JUDGES REALLY BEEN UNREASONABLE IN EVALUATING "BLOCKED AVAILABLE TONER" CLAIMS?

Another part of our recent call left me with a concern: your team continues to feel strongly that all the judges simply made bad calls. It was difficult to discern any openness to hearing my message that your frustration with the judges and their rulings – i.e. suspecting them of conservative, pro-corporate bias – appears to be substantially misplaced.

Over the past two years I have meticulously read, studied and annotated every motion, pleading and opinion related to every HP, Brother and Samsung case (including Arcand) as they became available online. Having a solid understanding of the "average projected yield based on 5% coverage" from the technology, business and consumer perspective I saw a very different problem – litigation based on hard-stopping of usable leftover toner is only legitimate to the extent that advertised yield had not been fully delivered. Yield is indeed the only truly useful measure of printer performance - as long as it is not being gamed by a dishonest manufacturer.

In reading the judges' rulings and opinions, I was actually surprised with the patience they demonstrated, providing your team every opportunity and encouragement to plead causes of action that might be legally viable - i.e. violations of actual promises made by the manufacturers that are based on a clearly defined international standard (that only needed to be properly explained to the judges because it is quite technical).

While I am 100% on the side of stopping HP yield fraud, if I were a judge, I would have no other choice but to rule exactly the same way, because alleging fraud based strictly on the blockage of available toner is plain WRONG, not only from a legal but also a practical perspective. As I tried to explain in our call, preloading extra toner, beyond that required to deliver full advertised yields, is a valid design strategy that serves consumers by lowering the cost of cartridges and improving the reliability and quality of printing. Hard-stopping (as long as it can be disabled without too much difficulty) is also a valid and useful feature, particularly for the networked, shared printers in the office or the home. Most consumers prefer not to waste time and paper on gradually faded-out printouts – as used to happen with the laser printers back in the 1990s.

Not having a technology consultant aboard to help your team fully understand and appreciate the implications of these technical issues led you into dead ends in the case of real HP fraud, and also lead to a lawsuit against a manufacturer, Brother, innocent of any fraud (if anything, Brother should have simply provided additional information in their manuals to alleviate consumer concerns about wasted toner).

It is essential that your team come to terms with this reality, because continuing to be in denial will lead to more self-defeating, costly mistakes down the line. If you operate from the perspective that all the judges are bad, you then lose all your power to overcome the obstacles, because you can't just get rid of these judges. Then you give up and cave into a bad settlement that hurts rather than helps consumers, because there is no injunctive relief and they might use e-credits to purchase cartridges that will further defraud them. On the other hand, re-evaluating your own cognitive perceptions and recognizing the blind spota allows you to regain power and look for and find an innovative approach for overcoming challenges you expected to face with the class certification based on yield fraud claims.

*One of the best lessons I learned in life is to never feel mad or disappointed in myself for making a mistake based on a blind spot, and to also reward rather than reject or punish the messenger who helps you become aware of it...   :)*

3)      LONG TERM VIABILITY OF YIELD-FRAUD BASED STRATEGIES

Now, you are absolutely correct, that under the traditional model of class action litigation, variability in the experiences of the defrauded class would present a problem – IF class certification were to be vigorously contested by the defense counsel.

However, this potential difficulty with class certification is real only if you don't take advantage of the innovation proposed by the *Integrity Capitalism Network* and assume that HP Board Of Directors would not be motivated to cooperate in the settlement and mitigation process once the other smoking gun was found during discovery – i.e. the identity of the fraud perpetrators (the smoking gun we already have is our study that proves that the yield fraud exists and exposes its primary mechanism).

As attorneys for the injured consumers, you do not have any way of reaching out to HP board or HP management, because professional rules of conduct restrict you to communicating with the defendant's counsel – who have no interest in recommending to the Board that your evidence should be evaluated.  In fact, part of their job is to provide a shield of plausible deniability to the board and the management.

On the other hand, the Integrity Capitalism Network (ICN) and its advisors and supporters in the Silicon Valley, being neither the plaintiffs nor the attorneys for the plaintiff, are not bound by such limitations.  Having access to a complete set of well documented evidence, ICN would be free to reach out directly to the individuals on the HP board, as well as individual members of the executive team, such as the new CEO.  These key decision makers to this day remain in the dark about any details of the LaserJet litigation, the yield fraud charges or the conduct of a relatively small group of managers and employees who developed this fraud to benefit themselves while jeopardizing the reputation and the long term financial health and competitiveness of their employer - HP corporation.  While HP pocketed tons of money unlawfully through this fraud, the corporation could have earned even more profits by developing super-efficient toner delivery technologies and business models, making laser printing affordable for every family and small business.  Further below, I will lay out the evidence of how and why reaching out to HP BOD will help settle this fraud.

As a side note, you might doubt that Sutherland team would have obtained any additional evidence of yield fraud beyond the scientific yield delivery study.  Being focused on the leftover toner, it is inevitable that your team's discovery did not quite look for the right evidence or ask the right questions during the depositions to follow the tracks of the yield fraud.  This is not for lack of intelligence or diligence, rather it is a completely normal outcome that, for example, leads astray many police investigations that pre-judge the guilt or innocence of certain parties and then focus on looking for the wrong evidence, failing to notice or recognize the significance of many facts as they become visible.  Just because you did not find evidence of "who, how, and when" the yield fraud was developed, does not mean that our team will miss it.  For example, if you had conducted a study that empirically proved yield fraud, it would have lead you to learn that it is accomplished by tweaking firmware in order to over-estimate the percent coverage for each color that's not used heavily.  In turn, you could have inquired who wrote the software that evaluates average per page toner coverage, etc, etc....

Setting aside doubts about uncovering additional evidence of fraud, how can we formulate a viable strategy towards settlement and mitigation?  Is our focus on yield-fraud "myopic" or does it have a viable endgoal?

Sutherland strategy has always been and continues to be based on a novel approach:  first conducting a thorough and unbiased investigation, including discovery, followed by giving ICN a chance to establish dialog and cooperation with HP BOD towards reaching an agreement for mitigation of toner fraud – including the class certification, and only applying media campaign pressure if necessary.  HP BOD repeatedly pledged in a public SBC contract that, if shown evidence of any misconduct by HP or its employees, they would never try to deny it through legal loopholes or cover it up, but would immediately take steps to stop and mitigate such misconduct, as they have decisively demonstrated in the 2006 pretexting and the 2010 Mark Hurd scandals – regardless of the short term embarrassment or costs.

With regards to the toner yield fraud, the pressure on the HP BOD would be even greater than in the previous two instances, because, upon full exposure of this misconduct in the media, consumers would have a clear and cost-free pathway to liberate themselves from further fraud and to walk away from HP products, thus damaging HP's revenue streams.  One full set of HP replacement cartridges costs the equivalent, for example, of one "same or better quality" Brother color laser printer with cartridges included, that will not defraud consumers of full yield delivery.  HP BOD, if presented with credible proof of fraud (that the Sutherland litigation had already mostly achieved, short of the names of HP employees who implemented it), would be under the pressure of not only avoiding the long term damage to HP's reputation, but of also protecting its immediate revenues.  Furthermore, they would be exposed to personal liability for failure to enforce the HP SBC and as a result getting sued by HP stockholders when the stock might fluctuate downwards following the exposure of the scandal.

Based on their track record over the past 5 years, having seen a well documented body of evidence provided by ICN, the HP BOD would then likely instruct HP Legal and HP's outside counsel to investigate further and hold the responsible employees accountable, have their PR firms structure a public apology for the mistakes made, and then move forward with, rather than oppose, the class certification process in order to establish a fair and comprehensive process for compensating the victims of this fraud, followed by releasing the software and firmware updates that remove fraudulent software from HP printers.

It is understandable that not having seen ICN achieve such an outcome, you might think that it is not realistic, however, you have not even given it a chance, and such pessimism is contradicted by the only known facts, which are that HP BOD followed the guidelines of HP SBC even when it was costly and embarrassing to do so.  And it is logical that they did – their personal interests are not at all the same as those of HP Legal department or HP's upper management team, including the executives in charge of the Printing and Imaging Group.

I hope that in hindsight, you can recognize that perhaps you should given ICN a chance, as both your litigation team and US consumers would have certainly not been worse off than they are right now.  On the up-side, you would have achieved a great victory for yourselves and the consumers and also built a long term relationship with a competent, resourceful and relentless ally.  The body of work I've shared with you might not have achieved the ultimate result yet, but it should give you a hint of what I was able to develop with virtually no resources or access to outstanding and highly experienced legal minds of your team.  Our actions should also have demonstrated to you the discipline and professional courtesy we've exhibited – in 2008 Darren asked me to make sure we don't get the Sutherland case into the hands of an attorney who will negotiate and accept a "bullshit coupon settlement" – and we did not, even though HP offered us a pathway to doing so in May 2009.  You can imagine how shocked we were to learn about the stipulated settlement, having expected you to stick with the appeal process, while we would pursue Sutherland case.  We still very much hope that you will re-evaluate your position and work with us to look for a real solution to stop this fraud.

However, lets also consider the pessimistic side - what do we do if Sutherland

proceeds with discovery, but then HP BOD fails to fulfill the obligations spelled out in the SBC, and Sutherland is then faced with vigorous opposition to class certification based on the variability of individual losses to yield fraud?

## 4)   ADDRESSING THE CLASS ACTION CERTIFICATION DILEMMA

Having taken your admonitions to heart re. "class certification hurdle," I've been doing some research on out-of-the-box ideas that might overcome this potential difficulty.

Enclosed in the email, please find a paper by a very bright student of law that might be applicable to our circumstances: **"Aggregate Reliance And Overcharges: Removing Hurdles To Class Certification For Victims Of Mass Fraud"** by Shawn S. Ledingham, Jr. I tracked Shawn down and spoke with him late on Tuesday night, and he thinks the HP case would be a most appropriate test scenario for his theory.

Please skim through his note to get a general feel for how the ideas might be applicable.

In short, after getting past the motion to dismiss and conducting discovery, *Sutherland* could amend the complaint based on the findings of that discovery (i.e. individuals who colluded in designing the technology of toner yield fraud, rather than the actual technology that implemented it, which is what we have so far). Alternately, we have a number of ready-to-go 2600n plaintiffs, as good as Martha, who can file a fresh Federal case based on the 2008-2010 starting dates for the statute of limitations, while Martha would remain a very helpful witness. The new causes of action could be based on yield fraud as evidence of the actual fraud, and civil RICO statutes, while the uniform damages to all the members of the injured class would be the price differential of HP printers and cartridges, in the context of fraudulent advertisement vs. accurate disclosure of performance characteristics. In other words, had HP honestly advertised its wasteful printers based on how they were actually programmed to perform (including their true operating costs over a 4-year lifetime), HP would have had to reduce their prices on these printers and cartridges by perhaps as much as 75% for consumers to still want to buy them compared to other printer brands that don't steal toner or require you to give up warranties and toner-out notifications by having to use the override mode. This price differential, or "fraudulent overcharge" can be claimed by every single member of the class, even if they never opened or used their HP 2600n "toner thief printer."

What are your thoughts? Could this be the "class-cert" solution we've been looking for to bring both a reasonable recovery and the injunctive relief to consumers?

Lastly I would like to take this opportunity to discuss the use of media to move proven fraud cases towards settlement and mitigation…

5)     CREATING INCENTIVES FOR MITIGATION OF DAMAGES IN MASS
       CONSUMER FRAUD CASES AT THE INTERSECTION OF LITIGATION AND
       MEDIA CAMPAIGNS

This is just a very brief comment, and if time permits, we really should have a
much longer discussion about ICN integrated media campaigns methodology.

Per his request, I've read up on Darren's work on the Dell case and the recent
coverage it was able to get in the mainstream media. While he deserves much credit for
pushing the Dell story as far and wide as he did, getting initial coverage in a multitude of
national publications and news reports is just one small part of what I was looking to
create with ICN.

While Dell management hates this kind of bad publicity, it is not what they
actually fear. Their actions are primarily driven by vectors that have an actual impact on
their private economic interests - as exposed by the internal Dell documents you've been
able to uncover. Dell management took preventive mitigating action only in those cases
where it stood to lose important high-volume customers who would switch to other
brands. **Tangible incentives are key**.

A great result in that case would be to get Michael Dell to hold a press
conference to apologize to all Dell customers and announce a full recall of the potentially
defective computers and make a promise that from now on Dell will immediately recall
any future equipment found to have systemic problems. *To gain the kind of leverage
that would result in such an unlikely outcome, a news blast is entirely
insufficient...*

Rather, it requires a pervasive, ongoing *"action and communication"* campaign
that creates ever escalating news events, beyond the mostly boring court activity, until
Dell management begins to see measurable damage to their sales and their brand that
potentially far exceeds the cost of a fair and reasonable settlement and full mitigation of
the original fraud they are now trying so hard to avoid.

To accomplish that level of media coverage and public participation you must
build up a powerful media brand. A lawyer or a law firm can never own or manage that
type of compelling brand because, rightly or wrongly, most people dislike and distrust
lawyers, and at best are bored by the complexity of their work. An average American
has never heard of Tom Girardi, but everyone knows Erin Brockovich. If Erin was not
there to build trust and community cohesion around common goals in Hinckley, that case
would have never come together through brilliant litigation alone.

In the most simplistic terms, the long term goal of the Integrity Capitalism
Network has been and remains to become an entertaining, passionate and irreverent
media brand that ordinary Americans would relate to, trust, and follow when called on to
act in support of protecting their own interests. As the numbers show, the public follows
both Michael Moore's and Paris Hilton's antics and they love to follow and participate in
competitions, like Celebrity Apprentice. Litigation, on the other hand is BORING most of
the time.

That is why you need an outside organization working on many simultaneous
cases to enable weekly episodic content in video and print, that coordinates its activities

with the litigation process, allowing attorneys to do what they do best in the court rooms, while they allow the ICN brand and its media celebrities to entertain and engage the public using the formula we call:

• IRRESISTIBLE FUN • IMPOSSIBLE CHALLENGES • NOBLE CAUSES ™

Right now we still have a golden opportunity to do this with the HP case without much risk, as you've already lost both the battles and the war, and HP is settling only because they need to kill the Sutherland case.  We can also spend our time cooperating on a launch of a number of additional worthy class action cases which have been lingering on the shelf for some time, for lack of visionary attorneys who are willing to at least try fixing a broken system, rather that make compromises with it, as unfortunately you appear to have done with the present settlement, which we have no choice but to vigorously oppose.

Sincerely,


Michael Vlastone

Founder, Program Director
Integrity Capitalism Network,  a project of the iShine Foundation

767 Bryant Street, Suite 410
San Francisco, CA 94107

O: 415-957-8703  [ preferred ]   M: 415-794-5112

E: VLASTONE@MAC.COM



Developing scalable solutions that hold accountable
business, government and independent professionals
using the tools of journalism, litigation, new-media and the social-web